921 A.2d 1122 (2007)
191 N.J. 38
UNIVERSITY COTTAGE CLUB OF PRINCETON NEW JERSEY CORP., Petitioner-Appellant,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent-Respondent.
The Borough of Princeton, Intervenor-Respondent.
Supreme Court of New Jersey.
Argued March 6, 2007.
Decided May 30, 2007.
*1124 Thomas M. Olson, Morristown, argued the cause for appellant (McKirdy and Riskin, attorneys; Mr. Olson and L. Jeffrey Lewis, on the briefs).
Jane F. Engel, Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General of New Jersey, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel).
Michael J. Herbert, Princeton, argued the cause for intervenor-respondent (Herbert, Van Ness, Cayci & Goodell, attorneys).
Justice LONG delivered the opinion of the Court.
The University Cottage Club of Princeton (Cottage) here challenges a final decision by the Commissioner of the Department of Environmental Protection (Commissioner) denying its petition for certification as a tax-exempt historic site. The Commissioner based his decision on an intention to promulgate more stringent rules governing public access to such sites and, in the interim, determined to deny all applications that did not meet "objectively reasonable standards of public accessibility." Cottage appealed, claiming among other things that public access is not a requirement for historic-site tax exemption. The Appellate Division affirmed. We hold that public access is an essential component of historic-site tax exemption but that the Commissioner acted arbitrarily in the denial of Cottage's application. Because Cottage satisfied all of the relevant standards in effect when its petition was perfected, it was entitled to tax-exempt certification. We therefore reverse.

I.
Cottage, a not-for-profit corporation under I.R.C. § 501(c)(3), is one of eleven private eating clubs.[1] Although not officially part of Princeton University, the eating clubs have traditionally been affiliated with Princeton's students. Cottage has operated at its current location in Princeton Borough (the Borough) since 1906. According to its constitution, "this privately owned and operated club is entirely for the use of its members and their accompanied guests, and is not open to non-members or the public."
The Cottage building, completed in 1906, is considered architecturally significant. Designed by the renowned, early twentieth century architect Charles Follen McKim, it is an example of the "club" style of architecture of the late-Victorian era.
In 1998, Cottage decided to apply for a property tax exemption as an historic site pursuant to N.J.S.A. 54:4-3.52. It initiated the process by letter to the Department of Environmental Protection (DEP), Office of Historic Preservation (OHP), which administers the tax-exempt historic-site certification process. In a return letter dated January 13, 1999, the OHP agreed that Cottage "is a key contributing building within the Princeton Historic District" and is "architecturally significant." It also informed Cottage that additional information was needed regarding its status as a non-profit organization, its commitment to the preservation of the building, its policy of non-discrimination, and its accessibility by the public.
In terms of public access, the OHP letter stated:
2. Open to the public, The property is not currently open to the public. This *1125 needs to be addressed. I am attaching a copy of one of the more recent "open to public notices" and copies of National Park Service "guidance" on what it means to be open to the public[,] required when federal funds go into restoring a historic property, but serves as a good guide for the minimum.
The included guidance material was a portion of the National Park Service's Historic Preservation Fund Grants Manual, which addressed the need for public access when federal funds are invested in an historic property:[2]
d. Public Access. "Public Access" means that the general public can see the results of the HPF [Historic Preservation Fund] investment of public funds.
1) As long as all the HPF-assisted work is clearly visible from a public right-of-way, public access to the property is not required. Public access is also not required when interior development work (such as electrical or plumbing repairs) would not be visible if general access to the property were to be provided. (However, the interior of a property acquired with grant assistance must be open to the public at least 12 days a year if the interior has any architecturally or historically significant features.)
In closing, the OHP explained "[o]nce these items have been addressed, and the municipality has been given an opportunity to comment on your petition, the Historic Preservation Office will process your request for certified historic site (tax exempt) status to the Commissioner of New Jersey Department of Environmental Protection for final deliberation."
In April 1999, the Board of Governors of Cottage passed a resolution "to confirm certain facts in order to facilitate said historic site designation." The resolution stated that "the club is committed to the preservation of the Clubhouse as a historic site"; "strictly adheres to a policy that does not tolerate illegal discrimination or harassment"; and "shall be open to the public for visitation on no less than twelve days, to be specified during each calendar year. Those days shall be published in a local newspaper each year." Cottage also submitted evidence of its non-profit status.
In September 1999, Cottage was listed in the New Jersey Register of Historic Places, and, in November 1999, in the National Register of Historic Places.[3] Over two years after Cottage had supplied all of the information sought by the OHP, the OHP wrote again to Cottage in June 2001:
Under provisions of the Laws of New Jersey (1962, Chapter 92, as amended 1964, Chapter 61), the Commissioner of the Department of Environmental Protection can make historic properties tax exempt from local property taxes if the property meets the following conditions:
1. Listed in the New Jersey Register of Historic Places.
2. Owned by a non-profit corporation; with a specific provision to preserve the building.
3. Open to the public on a regular basis.
4. Non-discriminatory in regard to race, creed, color or religion.
I am enclosing a list of items, which must be sent to this office before tax-exempt *1126 status can be determined. (There is no application form). All materials should be sent to the above address. Upon receipt of the requested information, we will begin to process your application.
The list of items included a petition requesting tax-exempt status to be signed by the officers of the corporation and returned to OHP along with evidence that the site:
a. Will be preserved by the said corporation.
b. Will be freely available to all people, without discrimination as to race, creed, color, or religion, under reasonable terms and conditions, such as a nominal fee, which would insure the preservation, and maintenance of the site.
c. Will be available to the public on a regular basis.
In essence, only the petition needed to be supplied because Cottage had previously satisfied the other requirements.
In July 2001, Cottage submitted "its petition to be declared a tax-exempt site," including a copy of the resolution approved by its Board in April 1999, as well as copies of published notices confirming that the Club had been "open for public visitation and appreciation" for six hours on twelve days in 1999-2000, for five hours on ten days and for two hours on two days in 2000-2001, and that it intended to be open for five hours on twelve days in 2001-2002.
The OHP then alerted the Borough of Cottage's application, and requested written comments. In August, 2001, the mayor responded:
Thank you for apprising me of the petition filed for Historic Site exempt status by the University Cottage Club at 51 Prospect Ave. in Princeton Borough.
You have asked me to comment on whether I believe that conditions have been met for granting Certified Historic Site status.
I do not believe that Cottage Club has.
First, you should recognize that being "non-profit" does not automatically qualify an organization for property tax exemption. In Princeton Borough, our Assessor has always expected a "non-profit" organization to have a distinct community, educational, and/or charitable purpose before granting such exemption. The University eating clubs on Prospect Ave. have applied for such exemption in the past and our Assessor has always turned them down. (They are off-campus clubs and clearly not part of the University.)
Secondly, your criteria says that: "The property must be open to the public on a regular basis." This is clearly not the case. In a "Statement of Princip[le]s" adopted on May 11, 1994 and recently reconfirmed, the InterClub Council and the Graduate InterClub Council affirmed that: "The Upperclass Eating Clubs are private organizations for the sole use of their members and their invited guests."
While occasionally the Clubs are rented out for weddings or private parties, I hardly think that this qualifies them as "open to the public on a regular basis."
During 2001 and early 2002, Cottage sent three letters to the OHP regarding the status of its application. In April 2002, eight months after it had been received, OHP forwarded the letter from the mayor to Cottage. In June 2002, Cottage responded:
The Borough of Princeton letter of August 13, 2001 comments on our "non-profit" organization status having a distinct community, educational and/or charitable purpose. The Club does in fact have an educational involvement with a number of University precepts and meetings, as well as a number of charitable events. We have also hosted *1127 numerous community projects such as "Food for the Poor," etc. Our well maintained McKim, Mead and White building (and grounds) is an ideal historic facility which contributes to our community needs. We plan to continue these policies.
Secondly, as indicated in the enclosed resolution, the "property" is open to the public on a regular basis. We not only publish special dates for visitations, but also have groups on an "invitational" basis.
Very clearly, we could not have met your criteria unless we adhered to the laws of New Jersey. We submit this response with the anticipation that it clarifies the evident objections of the Borough of Princeton. We sincerely hope that our meeting of these requirements of your office will permit the Commissioner of the Department of Environmental Protection to provide "Certified Historic Site" status for the University Cottage Club.
On November 4, 2002, the OHP advised the Commissioner that certification should be granted because all the requisite conditions had been met.
Thereafter, in December 2002, the mayor provided the OHP with a legal memorandum prepared by the Borough attorney and argued:
Cottage Club is one of several private eating clubs whose membership is made up of undergraduates and alumni of Princeton University. Granting such an exemption to this club would set a precedent by which a number of these eating and drinking places serving a private membership would attempt to be removed from our tax base. By no stretch of our imagination are these clubhouses "open to the public" in the sense that the Legislature ever contemplated.
We ask your due consideration. We trust that you, too, will find that Cottage Club does not meet the intent of the statute.
In March 2003, the Borough attorney wrote to the Commissioner requesting information on the status of the application. The Commissioner responded that the DEP had not yet made a determination because it was considering whether to recommend amendments to the tax exemption law to clarify the qualifications for tax-exempt status, including a requirement of public access of ninety-six days per year. Both Cottage and the Borough continued to write to the Commissioner for resolution of the issue.
Finally, in October of 2003, the Commissioner denied the application:
The [DEP] has determined to deny the application of University Cottage Club for historic property certification for the reasons set forth below. . . . Implicit in N.J.S.A. 54:4-3.52 and -3.53 is a legislative intent that in order to qualify for the exemption from property taxation, "any building, its pertinent contents" and that real property which is necessary for enjoyment of the building must be available to the public for its enjoyment. Further, in order for a building to "have material relevancy to the history of the State and . . . [warrant] . . . preservation as an historical site," public access must be provided in a meaningful way and not just by allowing public entry for a minimal number of days. As a private club, the building and property of the University Cottage Club are not and cannot be freely accessible on a regular basis to the public.
While I recognize the past practice that applicants for tax exemption need only satisfy the minimal public access requirements set forth in guidance borrowed from the National Historic Preservation program (which was created for a different purpose), I have determined *1128 that this guidance does not provide a sufficient degree of public accessibility to merit special dispensation from property taxation for buildings deemed historically important. Thus, I intend to promulgate regulations that would require that applicants for property tax exemption under this statutory scheme must meet standards that enable the public to freely access and enjoy any property that merits certification. Until such time as the rules are operative, I intend to deny all applications for properties that do not meet objectively reasonable standards of public accessibility.
The Commissioner never promulgated such rules. Instead, the Legislature enacted L. 2004, c. 183, §§ 1, 2, and 3 (eff. Dec. 22, 2004), which augmented the statutory provisions applicable to property-tax exemptions for historic sites by adding subsections -3.54a, -3.54b, and -3.54c to N.J.S.A. 54:4. The cumulative effect of those additional provisions was to prescribe more rigorous requirements for property-tax exemption by an historic site. Among other things, a non-profit corporation qualified for tax-exempt status under I.R.C. 501(c) seeking property-tax exemption for its registered historic property must have a "primary mission as an historical organization to research, preserve and interpret history and architectural history." N.J.S.A. 54:4-3.54a. Further, the property must be accessible to the public for at least ninety-six days per year. N.J.S.A. 54:4-3.54b(a)(4). Additionally, the amendments require cancellation of historic site certification if a non-profit corporation that owns a building certified after the effective date, December 22, 2004, fails at any time to comply with the new provisions. N.J.S.A. 54:4-3.54c. By their terms, those amendments are prospective.
Cottage appealed, and the Appellate Division affirmed. Affording deference to the Commissioner's interpretation of public access, the panel reasoned that the new legislation provided assistance in determining the original legislative intent to require such access. It further relied on the legislative history of the statute to support its view. Because of the narrow application of tax exemption, and the policy that construes exemptions against the claiming party, the Appellate Division held that the Commissioner had not abused his discretion in refusing to certify Cottage's property.
We granted certification and granted intervenor status to the Borough. 188 N.J. 577, 911 A.2d 69 (2006).

II.
Cottage argues that, on its face, the statutory scheme did not empower the DEP to mandate public access as a condition of the grant of a certification for tax exempt historic status, and, thus, the Commissioner's decision was arbitrary and capricious; that it violates our ruling in Town of Morristown v. Woman's Club of Morristown and Attorney General of New Jersey, 124 N.J. 605, 592 A.2d 216 (1991); that, in any event, Cottage had consented to the applicable public access requirement in 1999; and that the procedure engaged in by DEP was unfair.
DEP counters that public access is an essential element of an historic-site tax exemption,[4] and that its action was neither arbitrary nor capricious, but was a statutorily authorized exercise of its discretion. As might be expected, the Borough sides with DEP, adding that the decision does not violate Woman's Club and that there *1129 were no procedural improprieties in the case.

III.
Our role in reviewing an administrative agency's final decision is limited. In re Taylor, 158 N.J. 644, 656, 731 A.2d 35 (1999). We will not reverse an agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record. Ibid.
Generally, courts afford substantial deference to an agency's interpretation of a statute that it is charged with enforcing. R & R Mktg., L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175, 729 A.2d 1 (1999). An appellate court, however, is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." In re Taylor, supra, 158 N.J. at 658, 731 A.2d 35 (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973)). That is the backdrop against which this dispute must be assessed.

IV.
We begin with the amendments to N.J.S.A. 54:4 enacted subsequent to the Commissioner's denial of Cottage's application. Those amendments require, among other things, that an applicant's primary mission must be "historical," N.J.S.A. 54:4-3.54a, and that ninety-six days of public access per year be made available, N.J.S.A. 54:4-3.54b.[5]
Generally, an appellate court "will apply the statute in effect at the time of its decision, at least when the legislature intended that its modification be retroactive to pending cases." Riggs v. Twp. of Long Beach, 101 N.J. 515, 521, 503 A.2d 284 (1986) (quoting Kruvant v. Mayor & Council of Cedar Grove, 82 N.J. 435, 440, 414 A.2d 9 (1980)), rev'd on other grounds, 109 N.J. 601, 538 A.2d 808 (1988). "The purpose of the principle is to effectuate the current policy declared by the legislative bodya policy which presumably is in the public interest." Kruvant, supra, 82 N.J. at 440, 414 A.2d 9. Here, however, the new public access requirement applies, by its own terms, only where certification occurs after the Act's effective date of December 22, 2004. N.J.S.A. 54:4-3.54b(a). Moreover, there is no legislative history revealing an intent to the contrary. Thus, the new amendments operate only in connection with applications for certification after the effective date.
The question, therefore, is whether the Commissioner's October 2003 denial of Cottage's application was valid. If it was a valid denial, Cottage must reapply subject to the more restrictive 2004 amendments. If the denial was not valid, Cottage is entitled to have its tax-exempt status evaluated based on its satisfaction of the standards in effect at the time of the administrative adjudication.

V.
We turn now to the statutes in question. N.J.S.A. 54:4-3.52 provides in relevant part:

*1130 Any building and its pertinent contents and the land whereon it is erected and which may be necessary for the fair enjoyment thereof owned by a nonprofit corporation and which has been certified to be an historic site to the Director of the Division of Taxation by the Commissioner of Conservation and Economic Development as hereinafter provided shall be exempt from taxation.
N.J.S.A. 54:4-3.53, in turn, governs the certification of historic sites:
The Commissioner of Conservation and Economic Development when requested for any such certification and after consultation with and the advice of the Resource Development Council of the Division of Resource Development within his department shall certify a building to be an historic site whenever he finds such building to have material relevancy to the history of the State and its government warranting its preservation as an historical site and in the event of restoration, heretofore or hereafter made, such building is or shall be of substantially the same kind, character and description as the original.
Cottage argues that, on its face, the Act does not require public access as a condition of historic site tax exemption.
However, the Act's legislative history, although sparse, suggests otherwise. In May 1962, the then-Commissioner of the Department of Conservation and Economic Development[6] wrote to the Governor's Counsel with respect to the Act, which had not yet passed, expressing concern over an
assurance that any historic site declared to be tax exempt under the bill be available on a regular basis to the general public. . . . This is not specifically spelled out in the bill. However, if it is the judgment of the Governor's Counsel that this consideration could be a requirement of the Commissioner of Conservation and Economic Development before certifying the building as provided in Section 2, we would recommend it for the governor's signature.
[Commissioner, Conservation & Economic Development, Memorandum to Office of the Governor's Counsel at 1 (May 25, 1962).]
That letter echoed the point made by the New Jersey Historical Society recognizing the preeminent importance of the public being able to view historic sites. See Letter from New Jersey Historical Society to Governor Richard Hughes (June 10, 1962).
The Governor's response to those concerns was contained in his signing statement:
Since [New Jersey's fine historic] heritage is a possession of all the people, I have directed the Commissioner of Conservation and Economic Development to approve for exemption only those historic sites which will be freely available to all people without discrimination as to race, creed, color or religion, subject to reasonable terms and conditions, such as a modest entrance fee, which will insure the preservation and maintenance of the site.
[Office of the Governor, Press Release at 3 (June 27, 1962).]
Such a communication from the executive branch is an aid to legislative interpretation. 2A Sutherland Stat. Const. § 48:5 (Singer ed., 6th ed.2006) (action of governor upon bill is part of legislative process); Fields v. Hoffman, 105 N.J. 262, 270, 520 A.2d 751 (1987) (citing Skeer v. EMK Motors, *1131 Inc., 187 N.J.Super. 465, 472, 455 A.2d 508 (App.Div.1982)). Substantively, the exchange suggests that the DEP is correct in arguing that the long-standing administrative interpretation of the statute (over forty years) recognized a public access requirement. That interpretation is entitled to considerable weight. Kasper v. Bd. of Trs. of Teachers' Pension and Annuity Fund, 164 N.J. 564, 580, 754 A.2d 525 (2000).
In addition to what appears from the Act's legislative history, it seems to us a matter of common sense that public access is implicit in historic designation for tax-exemption purposes. As we noted of historic preservation in Woman's Club, supra, "[i]ts sole beneficiary is the public, the citizens of New Jersey, who receive the benefits of viewing the architectural beauty of the historic buildings and better understanding our heritage." 124 N.J. at 620, 592 A.2d 216. Equally important is the fact that tax exemptions drain the public coffers just as expenditures do, and could not be justified in the absence of public access.
Finally, we note that Cottage itself consented to the imposition of a public access requirement at every stage of the administrative process, inferentially recognizing the essential nature of such access to the legislative scheme. In short, we are satisfied that public access is a fundamental element of an historic site tax exemption.

VI.
We turn next to our decision in Woman's Club, which, Cottage argues, requires a contrary conclusion. There, we determined that an historically certified property the Dr. Condit Houseowned by the defendant, Woman's Club of Morristown, did not have to be used in any particular way to qualify for tax exemption. Id. at 608-11, 615-20, 592 A.2d 216. To support our statutory interpretation, we relied on the legislative history previously detailed here. Id. at 610-11, 615-17, 592 A.2d 216.
The heart of the issue in Woman's Club was whether a non-profit organization that rented portions of its exempt historic property to commercial entities to help defray its costs would lose its tax exemption because of that commercial use. Id. at 607, 592 A.2d 216. We answered no because there is no "use" limitation in the statute. Id. at 611, 592 A.2d 216. We continue to hold that view.
Cottage characterizes public access as a "use" and thus argues that Woman's Club supports its contention that public access cannot be compelled. That is a misreading of our decision. Initially, we do not view the concepts of use and access as interchangeable. Use is the basic purpose to which the property is put, for example, the basic purpose of a restaurant or a music hall. Public access is a condition of use, like hours of operation or parking. Those are distinct concepts.
More importantly, public access was an underlying assumption of our holding in Woman's Club. See, id. at 615-16, 592 A.2d 216. Indeed, the building was freely open to the public on a year-round basis for civic purposes and for pro bono activities such as fund-raisers for charities. Id. at 608, 592 A.2d 216. Local senior citizens used the auditorium for their lunches. Ibid. The combination of the commercial use of the building and its civic functions resulted in regular public access to the Dr. Condit House. Ibid. There is simply nothing in Woman's Club to support the notion that there is no public access condition to historic site tax exemption.
In short, we conclude that the Legislature intended that a fundamental aspect of an historic site tax exemption to be public access, and that to the extent the DEP required such access, it was within its statutory grant.

*1132 VII.
That is not the end of the inquiry. Cottage argues that the Commissioner nevertheless acted arbitrarily when he denied its application based on new and undeclared standards for public access. According to Cottage, the Commissioner's decision to jettison the prior public access standards and apply "objectively reasonable standards of public accessibility" constituted an "administrative rule" that had to be adopted in accordance with the Administrative Procedure Act (the APA), N.J.S.A. 52:14B-1 et seq. In the absence of such adoption, Cottage contends that the new standards were invalid.
Prior to adopting or amending any rule, an administrative agency must give notice of its intended action, N.J.S.A. 52:14B-4(a)(1), and afford interested parties a "reasonable opportunity to submit data, views or arguments, orally or in writing." N.J.S.A. 52:14B-4(a)(3). N.J.S.A. 52:14B-2(e) defines an "administrative rule" as follows:
(e) "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.
In Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 478 A.2d 742 (1984), we considered the issue of whether an agency determination constituted rulemaking, thereby requiring compliance with the APA's notice and comment procedures. Id. at 328-37, 478 A.2d 742. There, we enumerated six factors for courts to consider singly or in combination. Id. at 331-32, 478 A.2d 742. Under that framework, a rule
(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.
[Ibid.]
Here, the Commissioner's decision to reject what he had previously declared to be the applicable twelve-day public-access standard pending promulgation of his new and more stringent access requirement and to deny all pending applications that did not meet undisclosed "objectively reasonable standards" has all of the earmarks of rule-making. Plainly, the new scheme was intended to apply generally and uniformly to all similarly situated persons. Further, it was intended as a statement of an administrative position that had not been previously expressed, constituting a material change from a clear, past agency position on the subject. It was also intended to prescribe a standard, not clearly inferable from the enabling legislation, and was, in form and effect, a decision *1133 on administrative regulatory policy. Accordingly, it met the Metromedia paradigm.
To be sure, some agency actions are not subject to the APA's formal notice and comment requirements even if they satisfy the Metromedia criteria. See, e.g., N.J. Builders Assoc. v. N.J. Dep't of Envtl. Prot., 306 N.J.Super. 93, 100-04, 703 A.2d 323 (App.Div.1997) (holding administrative order was intra-agency statement when it directed DEP's assistant commissioners, not any member of public, to consider during anticipated rulemaking process). DEP claims that the order at issue was an exempt intra-agency statement because it was operating to improve its existing flawed procedures.
Our decision in Woodland Private Study Group v. New Jersey Department of Environmental Protection, 109 N.J. 62, 533 A.2d 387 (1987), is instructive in that respect. There, we considered whether an administrative order issued by the DEP was an "intra-agency statement" that did not require formal rulemaking. Id. at 63, 533 A.2d 387. The order at issue forbade responsible parties (those "alleged to have contributed to or caused contamination of a site") from conducting a remedial investigation/feasibility study (RI/FS), although it did "permit private parties to `participate' in the development of an RI/FS under certain conditions." Id. at 64-65, 533 A.2d 387. We stated:
Where a legally countenanced right of a party is threatened by an internal communication of an agency, rulemaking procedure must be followed. What constitutes an interest that cannot be abridged without rulemaking procedure is not easily defined. The interest alleged must ultimately be legitimate [and] of justifiable concern. . . .
The inquiry is whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected. Generally where the interest implicated is legitimate, the balance will tilt in favor of notice and hearing for internal actions that have a substantial impact on that interest. In light of the foregoing we can define an intra-agency statement as (1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public.
[Id. at 74-75, 533 A.2d 387.]
Because the DEP order in Woodland had a substantial impact on a legitimate interest of the regulated public by imposing severe restrictions and conditions on public participation, we held that it could not be viewed as an intra-agency statement immune from rulemaking procedures, and thus, was invalid under Metromedia. Id. at 76, 533 A.2d 387.
Despite Woodland's rather clear articulation of the applicable standard, DEP relies upon the Appellate Division opinion and this Court's affirmance in Citizens for Equity v. New Jersey Department of Environmental Protection, 252 N.J.Super. 62, 599 A.2d 516 (App.Div.1990), aff'd, 126 N.J. 391, 599 A.2d 507 (1991), for the proposition that its actions were exempt from the APA's rulemaking requirements because they were efforts to "improve its procedures." In Citizens for Equity, the DEP suspended the processing of claims from residents seeking compensation for damages from the operation of and the closure of landfills without notice to the claimants, pending its promulgation of a modified claims regulation. 126 N.J. at 393-94, 599 A.2d 507. According to DEP, the regulation needed correction because in its prior form it failed to achieve the purposes underlying the Sanitary Landfill Facility Closure and Contingency Act, N.J.S.A. 13:1E-100 et seq. Id. at 394, 599 A.2d 507. Individuals who had filed claims against the fund appealed. Ibid. The Appellate *1134 Division addressed the claim that the "secret" suspending of the processing of claims while DEP undertook a rule revision was illegal. Id. at 396-97, 599 A.2d 507. The panel rejected that argument, declaring that the suspension of claims pending a rule promulgation was an intra-agency statement exempt from the notice and hearing requirements of the APA under Woodland. Id. at 396, 599 A.2d 507.
We affirmed. Ibid. In so doing, we agreed that the suspension was an intra-agency statement exempt from the APA and declared that "[g]overnment has a duty to correct itself, and courts should not stand in the way when a governmental agency, acting in the public interest, attempts to improve its procedures." Id. at 396, 599 A.2d 507. However, we did not find the process to be fair:
Although we agree with the Appellate Division that the law did not require public notice or hearing before DEP could suspend the processing of claims for compensation under the Act, neither did the law prohibit the agency from disclosing to claimants what it was doing. The due-process standards incorporated in the New Jersey Administrative Procedure Act provide a minimum standard for agency conduct, but do not preclude an agency from acting fairly and candidly in respect of those whose interests may be affected by agency action. In other contexts we have noted that "government has an overriding obligation to deal forthrightly and fairly with property owners," F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426 [495 A.2d 1313] (1985), and have insisted that "government must `turn square corners' rather than exploit litigational or bargaining advantages. . . ." W.V. Pangborne & Co. v. New Jersey Dep't of Transp., 116 N.J. 543, 561 [562 A.2d 222] (1989) (quoting F.M.C. Stores Co., supra, 100 N.J. at 426 [495 A.2d 1313]).
. . . .
We are persuaded that in these circumstances DEP, irrespective of its statutory exemption, should have notified all claimants that the processing of claims was being temporarily suspended while the agency considered the adoption of the new regulations. Affording claimants such notice is a matter of fairness. Instead, the record suggests that some DEP personnel did not respond forthrightly to inquiries about pending claims until DEP was prepared to publish the revised regulations. The statutory exemption from the requirement of public notice and hearing does not relieve DEP of its duty of candor to the public.
[Id. at 397-98, 599 A.2d 507.]
Ultimately, in upholding the unannounced decision to stop processing claims, we determined that the absence of notice caused no substantial prejudice to claimants other than to "delay their awareness that their claims would be governed by new rules." Id. at 398, 599 A.2d 507. In reaching that conclusion, we took particular note of the fact that DEP only intended to apply the rules to claims that were filed but not yet processed. Ibid.
This case is wholly unlike Citizens for Equity. Here, Cottage's petition was perfected over a period of five years during which it satisfied every one of DEP's stated requirements. Indeed OHP sent the petition to the Commissioner with a recommendation for approval. Both Cottage and the Borough acknowledged that the petition had been perfected and sought a decision thereon during 2002 and 2003. Therefore, unlike Citizens for Equity, Cottage's petition was not simply filed but was, in fact, processed.
Moreover, the Commissioner did not merely suspend the processing of petitions in anticipation of the publication of a new rule. On the contrary, in one fell swoop he *1135 upended the prior public access requirement of twelve days, substituted an "objectively reasonable" standard without defining it, and used that undisclosed standard to deny Cottage's petition outright. If the conduct in Citizens for Equity troubled the Court then this conduct was inexcusable.
Although the Commissioner likely acted with good intentions, he was neither forthright nor fair when he denied Cottage's perfected and fully-processed petition. Cottage was entitled to an adjudication based on the regulations and standards the DEP had imposed upon it and that it had satisfied, including the twelve days of public access. Because the Commissioner's denial of Cottage's application was arbitrary, it cannot stand. Accordingly, Cottage is not subject to the 2004 amendments.
We note the Borough's concern that the grant of this tax exemption would set a precedent for removal of other eating clubs from its tax base. We view that concern as fanciful insofar as it is the unique history of this case that compels our conclusion and that, in any event, petitions for tax-exempt status filed after 2004 will be subject to the more stringent statutory requirements.

VIII.
The judgment of the Appellate Division is reversed. The matter is remanded to the Commissioner to take action consistent with the principles to which we have adverted.
For reversal and remandmentChief Justice ZAZZALI, Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS7.
OpposedNone.
NOTES
[1] For a discussion of the club system at Princeton University, see Frank v. Ivy Club, 120 N.J. 73, 83-90, 576 A.2d 241 (1990), cert. denied, 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991).
[2] There is no indication in the record that Cottage ever requested or received monetary assistance from the Historic Preservation Fund.
[3] In accordance with N.J.S.A. 13:1B-15.131, the listing of an area, site, structure, or object on the New Jersey Register of Historic Places prevents the State, or any of its subdivisions, from undertaking any project that will encroach upon, damage, or destroy the property listed without approval from the Commissioner.
[4] No other contention regarding any deficiency in Cottage's application has been advanced by DEP.
[5] Under the Act, a building can be open to the public for fewer than ninety-six days per year if the following exceptions apply: (1) the nonprofit corporation that owns the building applies to the Commissioner for approval of fewer days; (2) the governing body of the municipality in which the building is located passes a resolution in support of the nonprofit corporation's application for fewer days; and (3) the Commissioner determines, based on the nonprofit corporation's financial resources, that in that instance the ninety-six-day standard is not feasible. N.J.S.A. 54:43.54b(a)(4).
[6] The functions, duties, and powers of the Commissioner of the Department of Conservation and Economic Development, and the National Resource Council (formerly, the Resource Development Council), were transferred to the Commissioner of DEP pursuant to N.J.S.A. 13:1D-2 and N.J.S.A. 13:1D-3(b), respectively.