NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2921-22

IN THE MATTER OF
KENNETH NICOSIA
FLOOD HAZARD
GENERAL PERMIT
BY CERTIFICATION 5
NO. 1519-23-002.1 FHC230001.[1]

_____

APPROVED FOR PUBLICATION

July 30, 2024

APPELLATE DIVISION

Argued July 16, 2024 – Decided July 30, 2024

Before Judges Sabatino, Susswein, and Perez Friscia.

On appeal from the New Jersey Department of Environmental Protection.

Stuart J. Lieberman argued the cause for appellants Henry Dewing and Sarah Dewing (Lieberman Blecher & Sinkevich, PC, attorneys; Stuart J. Lieberman, of counsel; Ching Wei Michael Gan and Erica L. Peralta, on the briefs).

Jordan Viana, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Jordan Viana, on the brief).

John J. Jackson, III, argued the cause for respondent Kenneth Nicosia (John J. Jackson III & Associates,

---

[1] Although the briefs denote the permit number as "1419," the record shows the issued permit bears the number "1519."

LLC, attorneys; John J. Jackson, III, of counsel and on the brief; Jilian McLeer, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal arises from a denial by respondent New Jersey Department of Environmental Protection ("DEP") of a request by appellants Henry and Sarah Dewing to rescind what is known as a flood hazard area general permit-by-certification 5 ("GPC 5") granted to a neighboring residential property owner, Kenneth Nicosia. The Dewings own residential property in Mantoloking that abuts Nicosia's parcel, both located within a block of the Atlantic Ocean shoreline. Nicosia, a developer, sought the permit to replace a single-family house on the site with a new house.

After receiving notice of Nicosia's application for a GPC 5, appellants and several other Mantoloking residents submitted comments to the DEP contesting the application. The comments objected to the issuance of the GPC 5, and further alleged that Nicosia's ongoing construction of the new house was not adhering to the permit's conditions. A DEP Section Chief responded to the Dewings by email, rejecting their objections and declining to modify or rescind the permit. This appeal by the Dewings ensued.

Appellants principally argue that (1) the written notice they received of

2

Nicosia's permit application was deficient because it failed to state the permit was effective during the comment period; and (2) the applicable DEP regulations should be construed to require a GPC 5 applicant to show that an existing structure is not in "usable condition" due to "decay" or "damage." See N.J.A.C. 7:13-1.2 (defining the terms "reconstruct" and "repair" under the regulations).

For the reasons that follow, we affirm. The GPC 5 notice did not violate any statutory or regulatory provisions, nor was it constitutionally deficient. In addition, although the pertinent regulations are poorly worded and punctuated, the DEP has reasonably construed them to not require an applicant who, as here, seeks to replace a lawfully existing structure to demonstrate the structure is decayed, damaged, or otherwise not in usable condition. That said, nothing in this opinion precludes the pursuit of available enforcement remedies if the construction, as built, does not comply with the conditions of the GPC 5 or applicable statutes or regulations.

## I.

### A.

We begin with an overview of the statutory and regulatory scheme. "Under the Flood Hazard Area Control Act (FHAC Act), N.J.S.A. 58:16A-50 to -103, and its regulations, [the FHAC Act Rules,] N.J.A.C. 7:13-1.1 to -24.11,

certain types of developments are regulated and require permits if the development is in the flood hazard area or the riparian zone of a regulated water." Musconetcong Watershed Ass'n v. N.J. Dep't of Env't Prot., 476 N.J. Super. 465, 472-73 (App. Div. 2023). "The FHAC Act 'confers broad authority' on the DEP 'to protect the "safety, health, and general welfare" of the public by "deliniat[ing] and mark[ing] flood hazard areas" and subjecting them to "land use regulations."'" Id. at 476-77 (quoting Am. Cyanamid Co. v. State, Dep't of Env't Prot., 231 N.J. Super. 292, 297 (App. Div. 1989) (alterations in original) (quoting N.J.S.A. 58:16A-50(b))).

The FHAC Act Rules "shall be liberally construed to effectuate the purpose of the Acts under which it was adopted." N.J.A.C. 7:13-1.6. Specifically, the Rules are intended "to minimize damage to life and property from flooding caused by development within flood hazard areas, to preserve the quality of surface waters, and to protect the wildlife and vegetation that exist within and depend upon such areas for sustenance and habitat." N.J.A.C. 7:13-1.1(c). Likewise, the FHAC Act itself "shall be liberally construed to effectuate the purpose and intent thereof." N.J.S.A. 58:16A-64.

The general permit-by-certification ("GPC") program at issue here was adopted by the DEP in 2016. 48 N.J.R. 1067(a) (Jun. 20, 2016). The program

is codified in regulations set forth in N.J.A.C. 7:13-8.1 to -8.16 and is also subject to other FHAC Act regulations. Applicable to those regulations, N.J.A.C. 7:13-6.7 imposes five enumerated requirements designed to secure structures during floods and avoid interference with waterways, animal habitats, and vegetation. N.J.A.C. 7:13-6.7(b)(1) to (5). Additionally, "[e]xcept for normal property maintenance . . . and forest management activities . . . regulated activities authorized under a . . . general permit-by-certification . . . in combination with all proposed activities, shall not constitute a major development, as defined in the Stormwater Management rules at N.J.A.C. 7:8-1.2." N.J.A.C. 7:13-6.7(c).[2]

As a permit-by-certification, the GPC 5 in this case was issued automatically by the DEP after "completion of the application submission through the [DEP's] electronic system in accordance with N.J.A.C. 7:13-18.3 [specifying payment of fees and information to be supplied in the application]." N.J.A.C. 7:13-6.3. As highlighted by the DEP in its brief, permits-by-certification are available "for a tightly circumscribed subset of activities" where "tight limitations on the activity or activities that can be authorized enable the

---

[2] "Major developments" generally include construction for which approval is necessary under the Municipal Land Use Law. N.J.A.C. 7:8-1.2. No party alleges that Nicosia's proposed construction constitutes a "major development."

automated issuance . . . because there is no need for a case-by-case evaluation" of the application. 46 N.J.R. 1051(a) (Jun. 2, 2014). The DEP "will not entertain a request to review engineering calculations, in the context of an applicability determination or otherwise, for the purposes of determining that a proposed activity will meet any condition of a permit-by-rule or general permit-by-certification." N.J.A.C. 7:13-6.7(d).

The expedited process facilitated by the automatic approval of a GPC 5 is conditioned upon a regulation that expressly imposes liability on the person who is "seeking authorization under a general permit-by-certification . . . for ensuring that each condition . . . is met." N.J.A.C. 7:13-6.7(d). Moreover, "an authorization under a general permit-by-certification or general permit does not relieve the person conducting the authorized regulated activities from the obligation to obtain any other applicable permits or approvals required by law." N.J.A.C. 7:13-6.3(d).

These requirements apply to the sixteen categories of GPCs obtainable under N.J.A.C. 7:13-8.1 to -8.16. In addition to the GPC 5 for reconstruction of buildings at issue in this case under N.J.A.C. 7:13-8.5, applicants may seek GPCs for such activities as removal of debris from waterways, restoring agricultural banks, enhancing riparian zones, maintenance of stormwater

management structures, placement of solar panels or water monitoring devices, and other activities. N.J.A.C. 7:13-8.1 to -8.16.

A GPC 5 "authorizes the reconstruction, relocation, expansion, and/or elevation of a lawfully existing building located outside a floodway, provided [the GPC] conditions at N.J.A.C. 7:13-6.7 are met," and also:

> 1. The flood hazard area elevation for the site has been determined by [the DEP's] delineation or FEMA flood mapping . . . ;
>
> 2. The building is not located in a floodway;
>
> 3. The applicant obtains an engineering certification confirming that the building is not being expanded within or relocated into a floodway;
>
> 4. The footprint of the building has not increased by more than 750 square feet, cumulatively, since November 5, 2007;
>
> 5. The applicant obtains an engineering certification confirming that the lowest floor of the building is being reconstructed or elevated to at least one foot above the flood hazard area design flood elevation and no lower than the elevation required under the Uniform Construction Code, N.J.A.C. 5:23;
>
> 6. Any new enclosure below the lowest floor of the building is not used for habitation, remains open to floodwaters, and is constructed in accordance with N.J.A.C. 7:13-12.5(p);
>
> 7. Any existing enclosure below the lowest floor of the building, which does not conform to the requirements

7

of N.J.A.C. 7:13-12.5(p), such as a basement having a floor that is below grade along all adjoining exterior walls, is abandoned, filled-in, and/or otherwise modified to conform with the requirements of N.J.A.C. 7:13-12.5;

8. No disturbance is located within 25 feet of any top of bank, unless the project lies adjacent to a lawfully existing bulkhead, retaining wall, or revetment along a tidal water or impounded fluvial water;

9. Any building to be relocated is either moved outside a riparian zone or located within an actively disturbed area; and

10. No riparian zone vegetation is cleared, cut, and/or removed, except for vegetation within 20 feet of the building, where such disturbance is necessary to access the building and facilitate its reconstruction, relocation, expansion, and/or elevation.

[N.J.A.C. 7:13-8.5 (emphasis added).]

Critical to this appeal, the term "reconstruct" is defined by the FHAC Act

Rules within N.J.A.C. 7:13-1.2 as:

"Reconstruct" means to patch, mend, replace, rebuild and/or restore a lawfully existing structure to a usable condition after decay or damage has occurred, in which 50 percent or greater of the structure is replaced and/or the size, shape or location of the structure is altered. For habitable buildings, the percentage of replacement shall be determined by comparing the cost of the reconstruction to the market value of the building as determined before the start of construction; where the percentage of replacement is 50 percent or greater, such reconstruction shall also constitute a substantial

8

improvement as defined in this section.  For all other structures, the percentage of replacement shall be determined by comparing the area of the structure being reconstructed to the total area of the structure.

[N.J.A.C. 7:13-1.2 (emphasis added).]

This definition of "reconstruct" set forth in N.J.A.C. 7:13-1.2 complements the definition of a "repair" within the same set of regulatory definitions:

> "Repair" means to patch, mend, replace, rebuild and/or restore a lawfully existing structure to a usable condition after decay or damage has occurred, in which less than 50 percent of the structure is replaced and the size, shape or location of the structure is not altered. For habitable buildings, the percentage of replacement shall be determined by comparing the cost of the repair to the market value of the building as determined before the start of construction; where the percentage of replacement is less than 50 percent, such repair shall not constitute a substantial improvement as defined in this section.  For all other structures, the percentage of replacement shall be determined by comparing the area of the structure being repaired to the total area of the structure.

[N.J.A.C. 7:13-1.2 (emphasis added).]

Simply stated, under these definitions, a "repair" occurs when less than 50 percent of a lawfully existing structure is replaced, whereas a "reconstruction" occurs when 50 percent or more of the structure is replaced.  Here, Nicosia's construction fully replaces the pre-existing house, and thus must be evaluated

under the definition of a "reconstruction."

B.

With this regulatory backdrop in mind, we summarize the pertinent facts and procedural history concerning Nicosia's GPC 5.

As noted above, Nicosia is a real estate developer. He is the owner of residential property on Ocean Avenue in Mantoloking. On April 13, 2023, Nicosia mailed notice to all owners of property within 200 feet of his property of his intention to replace the existing single-family dwelling pursuant to a GPC 5 to be obtained from the DEP. Among other things, the notice stated that the new house would "compl[y] with the elevation and flood requirements [of] the New Jersey Flood Area Control Act Rules at N.J.A.C. 7:13 et seq."

The notice stated the permit application could "be reviewed at the municipal clerk's office." It further advised that persons "may provide comments concerning the proposed development and site" through "written comments within 30 calendar days." The notice supplied an address at the DEP for this purpose, attention to the "Borough of Mantoloking Supervisor."

The following day, Nicosia filed an application with the DEP for a GPC 5. The DEP automatically issued the permit the same day.

In early May 2023, several neighbors submitted comments to the DEP. Apart from appellants, the commenters included approximately seven other households. The commenters raised concerns about the quality and quantity of fill dumped at the construction site, the clearance of all vegetation, the construction of a concrete retaining wall that might alter water flow throughout the neighborhood, the demolition of the preexisting house, the planned four-foot increase in lot elevation, and other aspects of Nicosia's plan. One commenter claimed to have conducted "a visual inspection" and observed the "fill appears to be strewn with construction debris including degradable organic and metallic articles" and was not "clean fill" compliant with Borough ordinances and State regulations.

Appellants Henry and Sarah Dewing submitted a comment to the DEP on May 11, 2023, objecting to the permit as ineligible for a GPC 5 and against DEP flood regulations. Their comment was submitted by an attorney, who alleged Nicosia, without a permit, had demolished the preexisting house and constructed a wall around three sides of the lot. The Dewings' counsel asserted the house had been in good condition before its demolition, arguing a GPC 5 was therefore inappropriate because N.J.A.C. 7:13-8.5 allegedly is only available to restore or replace damaged homes. Further, the Dewings asserted the construction of a

11

wall "surrounding almost three sides of the lot" redirected flood flows onto Route 35, a State highway and "evacuation route" "not designed to collect and drain flood or storm waters." The Dewings further alleged the construction of the wall involved excavating not only Nicosia's property, but also involved excavating part of their own property.

To support their objections, the Dewings commissioned a report by Becht Engineering BT, Inc. ("Becht Engineering"). Becht Engineering determined the new construction covers 2,811 square feet, in contrast to the 1,600 square feet occupied by the previous dwelling.

Becht Engineering's report incorporated a report prepared by Coastal Environmental Consulting, LLC ("Coastal Environmental"). Coastal Environmental's report opined that a GPC 5 is inappropriate for Nicosia's construction because the site plans contemplate increasing the footprint of the original home by more than 750 square feet and because the DEP never verified the flood hazard area elevation of the site, a requisite of a GPC 5. Coastal Environmental contended that a "GPC 6" permit under N.J.A.C. 7:13-8.6 was more appropriate.

The Dewings further commissioned a report by Princeton Hydro, LLC ("Princeton Hydro"). The report alleged Nicosia demolished the home in

December 2022, began filling the site with soil and constructing a retaining wall in January 2023, and continued construction until issuance of a cease-and-desist order by an Ocean County agency in January 2023 and a stop work order by the Borough of Mantoloking later that month. Like Becht Engineering and Coastal Environmental, Princeton Hydro asserted that a GPC 5 was inappropriate because the preexisting structure was not damaged.

On June 8, 2023, DEP Section Chief Keith P. Stampfel, P.E., emailed the Dewings' attorney with a response to their objections. In that email, Stampfel stated:

> I did a review of this permit and I don't see any problem with [it]. There was a house existing at least until September 2022 (that is the most recent nearmap imagery that we have, but the house could have been there even later than that), so we would allow that to be considered a reconstruction of an existing house.
>
> There is also a reference to an objection regarding a retaining wall, but that is not regulated under the FHA regulations since it is not in a floodway nor is it in a regulated water itself or within 25' top of bank.
>
> Also, if the permittee wants to install a pool in the future, they would be able to qualify for a FHA permit by rule #21, so that wouldn't require additional FHA permits other than the PBR.
>
> There is also a reference to stormwater management and grading objections, however that would be reviewed under the local level since it is not a 'major

13

development,' so a stormwater management review isn't required at the State level.

It should also be noted that a FHA Verification is not required for a [GPC 5].

[(Emphasis added.)]

After receiving Stampfel's email, the Dewings filed this appeal of the DEP's final agency decision. R. 2:2-3(a)(2). The record does not inform of us what, if any, responses the DEP may have provided to the comments of the other objectors.[3]

## II.

We apply well-settled principles in reviewing the issues raised in this administrative appeal. Appellate courts "will not reverse an agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton N.J. Corp. v.

---

[3] We learned at the appellate oral argument that separate litigation is pending in the Law Division challenging the approvals Nicosia obtained under the MLUL from the Mantoloking Joint Planning and Zoning Board. Counsel for Nicosia represented to us that the construction of the new house is nearly completed. Appellants' counsel noted that a letter had been previously served on Nicosia, warning that such continued construction would be at his own risk while this litigation has been pending.

N.J. Dep't of Env't Prot., 191 N.J. 38, 48 (2007). "Generally, courts afford substantial deference to an agency's interpretation of a statute that it is charged with enforcing . . . [but] [a]n appellate court, however, is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" Ibid. (quoting In re Taylor, 158 N.J. 644, 658 (1999) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973))).

Guided by these standards, we address the two main issues presented by appellants: (1) the alleged deficiency of the notice, and (2) whether the definition of a "reconstruction" requires GPC 5 applicants to prove that a lawfully existing structure is not in usable condition due to either "damage" or "decay."

A.

The notice issue is the easier of the two main issues on appeal. At oral argument, counsel represented to us that the notice form used by Nicosia was patterned after sample forms on the DEP website.

A key facet of our notice analysis, which the Attorney General has highlighted in a supplemental brief, is the distinction within the state Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-1 to -31, between a "public notice" process utilized for rulemaking and a "public notice" process

15

used in a permit context such as the one before us. This distinction is reflected by the difference within the APA between N.J.S.A. 52:14B-4(a)(4) (providing for public distribution of "the agency's response" to objections to proposed new rules) and N.J.S.A. 52:14B-3.1(a) (allowing any "interested persons" to submit objections to DEP permitting decisions, but not imposing requirements for an agency response).

Because this case involves a permitting dispute rather than a challenge to the adoption of DEP administrative rules, there are no provisions within the statutes or regulations that required the DEP to respond to the comments received from appellants or the other objectors to the Nicosia permit. As the DEP acknowledges, its obligation is simply to consider the comments, if any, that are submitted from the public. Such consideration is duly reflected in Section Chief Stampfel's June 8, 2023 email. To be sure, the email does not explicitly respond to each comment submitted on appellants' behalf[4] and their retained experts. However, nothing in applicable statutes, regulations, or case law mandates that degree of specificity. The email reflects that, at the very least, the DEP gave substantial consideration to appellants' comments.

---

[4] We need not address whether the DEP duly considered the objections from the other commenters who, unlike the Dewings, have not appealed.

16                                                                          A-2921-22

The Dewings argue the public comment process is "flawed" as applied to permits-by-certification because the automatic issuance of such permits and their immediate publication in the DEP Bulletin starts: (1) the 30-day period to request an adjudicatory hearing under N.J.A.C. 7:13-23.1(b), and (2) the 45-day period to appeal to this court under Rule 2:4-1(b). The Dewings maintain neither of those avenues of review are informed by the public comment process, which requires no response of the agency and calls for submissions within 30 days of the permit's issuance.

The Dewings' contentions of procedural shortcomings are undermined by their limited status as third-party objectors to a permit issued by the DEP. The APA "prohibit[s] State agencies from promulgating rules and regulations which would allow third party appeals of permit decisions unless specifically authorized to do so by federal law or State statute." N.J.S.A. 52:14B-3.1(d). That provision of the APA still recognizes the "constitutional and statutory rights and remedies" of people "who have particularized property interests or who are directly affected by a permitting decision," which the Dewings could vindicate through an adjudicatory hearing. N.J.S.A. 52:14B-3.1(b). But they requested no such adjudicatory hearing in this case.

Appellants contend the notice form used for GPC 5 permits should explicitly advise would-be objectors that the permit recipient can immediately proceed with demolition and construction and does not have to wait before the 30-day comment period expires. That proposed enhancement to the notice form, however, raises policy concerns beyond the scope of this appeal.

The policies underlying the GPC 5 program strive to minimize delay. A key facet of the permit-by-certification program is to enable property owners who abide by the rules to move ahead with their construction activities expeditiously, and not get bogged down with bureaucratic delays and unwarranted litigation burdens. Indeed, we can take judicial notice that such expediency became especially important in recent years as New Jersey shore communities were rebuilt in the aftermath of Superstorm Sandy. If, as here, an affected third party has a valid objection to the permit, it does not have to wait a full 30 days to voice its concerns and take action.

Third-party objectors have limited constitutional interests in participating in the procedures used for DEP permitting. See In re Riverview Development, LLC, 411 N.J. Super. 409, 425-29 (App. Div. 2010). Here, the basic elements of notice and an opportunity to be heard are met by the existing GPC 5 process. Mathews v. Eldridge, 424 U.S. 319, 332-35 (1976). Any suggested

enhancements of that process can be pursued generally outside of this appeal through a petition for rulemaking under N.J.S.A. 52:14B-4(f).

B.

Appellants' second point—which their counsel declared at oral argument to be their primary ground for reversal—stems from the wording and punctuation of the definition of "reconstruct" within N.J.A.C. 7:13-1.2, which applies to GPC 5 permits. We repeat the full definition here for the reader's convenience.

> "Reconstruct" means to patch, mend, replace, rebuild and/or restore a lawfully existing structure to a usable condition after decay or damage has occurred, in which 50 percent or greater of the structure is replaced and/or the size, shape or location of the structure is altered. For habitable buildings, the percentage of replacement shall be determined by comparing the cost of the reconstruction to the market value of the building as determined before the start of construction; where the percentage of replacement is 50 percent or greater, such reconstruction shall also constitute a substantial improvement as defined in this section. For all other structures, the percentage of replacement shall be determined by comparing the area of the structure being reconstructed to the total area of the structure.
>
> [N.J.A.C. 7:13-1.2 (emphasis added).]

As we noted above, appellants want us to construe the first sentence of the definition to require GPC 5 applicants to show that a lawfully existing structure

19

is decayed or damaged, and therefore not in usable condition. In their opposition, the DEP and Nicosia interpret the text to not require such a showing in a context where, as here, a property owner seeks to "replace" an existing structure.

Our interpretative task is guided by well-established principles. "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). A court should "ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (internal citations omitted); see also State v. Gomes, 253 N.J. 6, 15-16 (2023). Those same core principles for construing statutes apply to the judicial interpretation of administrative regulations. Patel v. N.J. Dep't of Treasury, A-2370-22, __ N.J. Super. __, __ (App. Div. 2024).

"In the absence of explicit indication of a special meaning, words will be given their ordinary and well understood meaning." In re Schedule of Rates for Barnert Mem'l Hosp., 92 N.J. 31, 40 (1983). In addition, courts should attempt to accord meaning to all words of a codified provision. Smith v. Dir., Div. of Tax'n, 108 N.J. 19, 27 (1987) ("it is well-established that a [code] should not be

construed in a manner that renders any portion of it a nullity"); see also Med. Soc. of N.J. v. N.J. Dep't of L. & Pub. Safety, 120 N.J. 18, 26-7 (1990) ("[W]e should try to give effect to every word of the [code], and should not assume that the [drafter] used meaningless language . . . [n]or should we construe the statute to render part of it superfluous").

The interpretation of N.J.A.C. 7:13-1.2's definition of "reconstruct" is complicated by the use of the term "and/or" within the first sentence: "to patch, mend, replace, rebuild and/or restore a lawfully existing structure to a usable condition after decay or damage has occurred . . . ." (emphasis added). As Judge Fisher rightly pointed out in State v. Gonzalez, 444 N.J. Super. 62, 71-76 (App. Div. 2016), the term "and/or" can breed confusion. Grammatically, "and/or" literally conveys that any one of the items within a list can be true, or some of them, or all of them. Ibid.

Applying that "and/or" concept here, the term "reconstruct" encompasses "patch" or "mend" or "replace" or "rebuild" or "restore" a lawfully existing structure, or to perform all or some of those activities. Any one of those terms suffices.

Common dictionary definitions treat the terms "patch" and "mend" as

synonymous or overlapping.[5]  Likewise, the terms "rebuild" and "restore" have substantially cognate meanings.[6]  All of these words, to some extent, connote actions undertaken to address a deficiency.

The term "replace," however, is unlike the others on the list.  Something need not be in damaged condition in order to be replaced.  Merriam-Webster defines "replace" as "to put something new in the place of."  Replace, Merriam-Webster,  https://www.merriam-webster.com/dictionary (last visited Jul. 24, 2024).  With respect to a home, a property owner may want to replace it, not because it is in disrepair or dilapidated, but because the owner wishes to have, say, a more modern, attractive, or energy efficient one.  To be sure, at times an owner will want to replace a structure, rather than try to restore it, because it is in disrepair.  The cost of home restoration can often be far greater than replacement of the structure with new materials.  But that logically is not the only reason that can motivate such a desire.

---

[5]  To "patch" is "to mend, cover, or fill up a hole or weak spot," whereas to "mend" is "to free from faults or defects" or "put into good shape or working order again."  Patch, Mend, Merriam-Webster, https://www.merriam-webster.com/dictionary (last visited Jul. 24, 2024) (emphasis added).

[6]  To "rebuild" is "to restore to a previous state," whereas to "restore" is "to bring back to or put back into a former or original state."  Rebuild, Restore, Merriam-Webster,  https://www.merriam-webster.com/dictionary (last visited Jul. 24, 2024) (emphasis added).

This leads us to consider the phrase that follows the list of verbs: "a lawfully existing structure to a usable condition after decay or damage has occurred." We concur with the DEP and Nicosia that this phrase does not have to modify each of the verbs that precedes it. If that were the case, it would eliminate the wide range of circumstances in which an owner would want to "replace" a structure for reasons other than disrepair. The definition of reconstruct was crafted broadly to include replacements, not just synonyms for fixing things that need repair.

Such an interpretation also harmonizes the GPC 5 with the GPC 6, which is a permit used for construction of new single-family dwellings on lots with no preexisting structures. N.J.A.C. 7:13-8.6. No additional requirements are imposed on GPC 6 applicants beyond those applicable to GPC 5s, suggesting the distinction between the two permits is the existence of a prior structure. If GPC 5 construction required decay or damage of the preexisting structure, replacement of dwellings for energy efficiency, aesthetic, or other non-rehabilitative purpose would not be suitable for any GPC. Thus, it would be inexplicably harder to obtain approval for demolition and replacement of an energy inefficient home than the automatically-authorized demolition and replacement of a decayed home through a GPC 5 or the construction of a new

23

home on a vacant lot through a GPC 6.  Appellants' interpretation of the GPC 5 regulation conceivably could incentivize property owners to encourage damage or decay to qualify for a GPC 5.

Although the question is not free from doubt, we construe the agency's regulation in the manner it has interpreted it.  We do so mindful of the agency's expertise within the zone of its statutory responsibilities.  Although deference is not warranted on pure questions of law, courts generally "afford substantial weight to an administrative agency's own interpretation of its delegated functions."  State v. Coviello, 252 N.J. 539, 557 (2023); see also Patel v. N.J. Motor Vehicle Comm'n, 200 N.J. 413, 420 (2009).

In reaching this conclusion, we by no means diminish the importance of compliance with our state's environmental laws.  The permit-by-certification process authorized by the flood control statutes and regulations is a special program designed to enable compliant property owners to obtain permits expeditiously.  That process ought not to be regarded as acquiescence to environmental harm.  Recipients of GPC 5 permits must still adhere to the pertinent FHAC Act requirements as they proceed with construction.  We trust the DEP in its important role as an environmental enforcement agency will be attentive to such compliance.

Consequently, the DEP did not act in a manner that was arbitrary or capricious, or contrary to law, in rejecting appellants' claim that Nicosia needed to prove the existing house was damaged or decayed or in non-usable condition in order to obtain a GPC 5. We therefore sustain its decision.

## C.

To the extent we have not discussed any remaining arguments of appellants, they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). However, nothing in this opinion precludes enforcement action if Nicosia fails to comply with the conditions of the GPC 5 or applicable statutes or regulations.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2921-22