TRAP ROCK INDUSTRIES, INC., A NEW JERSEY CORPORA-
TION, RESPONDENT, v. ALAN SAGNER, COMMISSIONER
OF THE DEPARTMENT OF TRANSPORTATION, AP-
PELLANT.

Argued October 20, 1975——Decided March 23, 1976.

*Mr. Richard L. Rudin,* Deputy Attorney General, argued the cause for appellant (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Rudin,* on the brief).

*Mr. Justin P. Walder* argued the cause for respondent (*Messrs. Walder, Steiner, Sondak and Evenchick,* attorneys; *Mr. Walder,* of counsel and on the brief).

PER CURIAM. Three members of the Court vote to affirm substantially for the reasons expressed by the Appellate Division and three members of the Court would reverse for the reasons expressed in the separate opinion of Justice Mountain. The Court being equally divided, the judgment of the Appellate Division is affirmed.

MOUNTAIN, J. Three members of this equally divided Court vote to affirm the decision of the Appellate Division substantially for the reasons set forth in its opinion, reported at 133 *N. J. Super.* 99 (1975). For convenience I will hereafter refer to this as the prevailing opinion.

On November 23, 1971 this Court decided *Trap Rock Industries, Inc. v. Kohl,* 59 *N. J.* 471 (1971), *cert.* den., 405 *U. S.* 1065, 92 *S. Ct.* 1500, 31 *L. Ed.* 2d 796 (1972), in which we upheld the decision of then Commissioner of Transportation, John C. Kohl, to suspend Trap Rock as a qualified bidder on highway contracts to be awarded by the Department of Transportation. The decision rested upon the fact that the president and board chairman of Trap Rock, Michael J. Stavola, who was also the owner of 80% of its capital stock, had been indicted for conspiracy to bribe and for offering a bribe to a member of the State Police. Stavola was subsequently convicted. Pursuant to proceed-

ings following Stavola's conviction, the Commissioner of Transportation, acting under authority granted by *N. J. S. A.* 27:7–35.8, barred Trap Rock for a period of five years from bidding on highway contracts. This determination was also sustained by this Court. *Trap Rock Industries, Inc. v. Kohl,* 63 *N. J.* 1 (1973). The decision to debar Trap Rock was expressly without prejudice to its right to apply for reinstatement during the five year period, if it could demonstrate that Michael J. Stavola had divested himself of all interest in the corporation and had ceased to exercise control of it. Trap Rock did so apply for reinstatement. Following a hearing, Commissioner Kohl decided, on June 29, 1973, that Stavola had in fact divested himself of all interest in and control over the corporation. Accordingly, as of that date, he ordered reinstatement.

Thereafter Trap Rock submitted bids with respect to various highway projects, was upon occasion the successful bidder and performed work for the Department of Transportation. On September 5, 1974 the corporation entered a plea of guilty in the United States District Court for the District of New Jersey to an indictment charging it with having unlawfully made and filed a false federal income tax return for the fiscal year ending February 28, 1970. It was sentenced on its guilty plea and ordered to pay a fine of $3,500. Upon learning of this development Commissioner Sagner immediately held a hearing at which he determined that Trap Rock lacked the moral integrity to continue as a qualified bidder with respect to highway contracts. From this decision an appeal was taken to the Appellate Division, which reversed the Commissioner's ruling. We granted certification. 68 *N. J.* 160 (1975).

My chief reason for registering dissent from the views expressed in the prevailing opinion rests upon a conviction that it announces an unfortunate and quite serious departure from the position taken by this Court in *Trap Rock Industries, Inc. v. Kohl, supra,* 59 *N. J.* 471. In that case a unanimous Court, speaking through former Chief Justice

Weintraub, analyzed in some depth and with a good deal of precision the nature of the relationship between the State and those from whom it purchases services or materials. It may provide a useful preface to quote some significant passages from that opinion:

> We start with the premise expressed in *Perkins v. Lukens Steel Co.*, 310 *U. S.* 113, 127, 60 *S. Ct.* 869, 84 *L. Ed.* 1108, 1114–1115 (1940), that "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." The State need not resort to competitive bidding. (citing cases) And if the Legislature chooses to direct competitive bidding, it need not mandate an award to the "lowest" responsible bidder but rather may vest in its agent the discretion to accept the bid of "that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the State, price and other factors considered," as the statute provided in *Commercial Cleaning Corp. v. Sullivan*, 47 *N. J.* 539, 548 (1966).
>
>    *      *      *      *      *      *      *      *
>
> [T]he purpose of a procurement program is not to advance the interest of those who want the State's business. On the contrary, the purpose is to serve the State's interest as purchaser.
>
>    *      *      *      *      *      *      *      *
>
> That he [low bidder] has an interest of some character which will support a claim to be heard cannot be questioned. The point to be stressed is that the interest, whatever its dimensions is conferred upon him to the end that the public will obtain all that is due it in the procurement process, rather than for his individual aggrandizement.
>
>    *      *      *      *      *      *      *      *
>
> We find no purpose to vest in a preclassified bidder any "right" which derogates the primary right of the State through its Department of Transportation to do business, in the words of *N. J. S. A.* 27:7–30, with "the lowest *responsible* bidder." [Emphasis ours]
>
> Thus, the bidder's "rights" remain subordinate to the primary interest of the State as a consumer. We must give ultimate regard to the State's welfare. Trap Rock . . . cannot be accorded any "right" which would subvert the primary objective of the statute, that the State do business with a "responsible" bidder.
>
>    *      *      *      *      *      *      *      *
>
> It is settled that the legislative mandate that a bidder be "responsible" embraces moral integrity just as surely as it embraces a capacity to supply labor and materials. (citing authorities). The relevancy of moral responsibility is evident. It heads off the risk of collusive bidding. It assures honest performance. It meets the

citizen's expectation that his government will do business only with men of integrity. [59 *N. J.* at 478–82]

At least two points require emphasis: first, the State is at liberty to do business with whom it wishes and second, its procurement procedures, as set forth by the Legislature, are intended to serve the sole purpose of protecting and safeguarding the public interest. They are not designed to create "rights" in those who would profit from business transacted with the State. Clear recognition of these truths, as well as strict adherence to their fulfillment, are especially needed in an area of governmental activity where understandable mistrust on the part of the public is as pervasive as it is today. Nor should we overlook the clear concern which the Legislature has evinced in this very sensitive field. The statute which sets forth the manner in which persons desiring to submit bids on highway work shall first become prequalified to do so, *N. J. S. A.* 27:7–35.1 *et seq.,* contains the provisions quoted below.[1] I call attention to these legislative pronouncements which condemn certain conduct with which we are not here directly concerned, to underscore the

---

[1]Any person who makes, or causes to be made, a false, deceptive or fraudulent statement in the questionnaire required to be submitted, or in the course of any hearing under this act shall be guilty of a misdemeanor, and upon conviction shall be sentenced to pay a fine of not less than $100.00 nor more than $1,000.00; or, in the case of an individual or the officer or employee charged with the duty of making such questionnaire for a person, firm, co-partnership, association or corporation, to pay such fine or undergo imprisonment, not exceeding 6 months, or both. All such persons and any copartnership, association, corporation or joint stock company of which any such person is a partner or officer or director, and any corporation of which he owns more than 25% of the stock, shall for 5 years from the date of such conviction be disqualified from bidding on all public work in this State. [*N. J. S. A.* 27:7–35.9]

The commissioner shall cause the forfeiture as liquidated damages to the State of any certified check or certificate of deposit deposited by any person who makes or causes to be made any false, deceptive or fraudulent statement in the questionnaire or bid information required to be submitted, or in the course of any hearing under this act. [*N. J. S. A.* 27:7–35.10]

clear legislative insistence that there be integrity in this important and sensitive area. In the creative task of fashioning law in the course of the adjudicatory process, courts should look for guidance — far more than they customarily do — to the *spirit and general purpose* which pervades relevant legislation, even though that legislation — as is true here— fails to speak directly to the issue before the court. Examining the statute in this more general sense, we discover the Legislature to have been so anxious to compel honesty and fair-dealing on the part of those who would do business with the State that it has seen fit to impose the severe sanctions of forfeiture and criminal penalties for a deviation from meticulous compliance. Surely this Court should give prominent place to this clear manifestation of legislative concern in reaching its decision in this case.

My second reason for calling attention to the statutes quoted above is to point out that the Legislature has not hesitated to impose sanctions upon corporations, although dereliction has in fact been that of an officer or agent. This will be discussed more fully below.

I fear that the decision reached today does not comport with the high standards announced by this Court and by the Legislature in the decision and statutes to which reference is made above.

For another and quite different reason I find myself unable to share the views set forth in the prevailing opinion. That opinion treats the matter as if we were dealing with an administrative agency; but we are not. Rather we are concerned with the Department of Transportation, "a principal department" established "in the Executive Branch of the State Government." *N. J. S. A.* 27:1A–2. The head of this department, the Commissioner of Transportation, is appointed by the Governor with the advice and consent of the Senate, and "shall serve at the pleasure of the Governor during the Governor's term of office." *N. J. S. A.* 27:1A–4. The powers of the Commissioner are extensive; they include the supervision and development of all modes of transportation, *N. J.*

*S. A.* 27:1A–5. The Commissioner is endowed with particular supplemental powers relating to the construction and maintenance of highways, *N. J. S. A.* 27:7–21. Far from heading an administrative agency of the regulatory type, the Commissioner of Transportation is in charge of one of the major executive arms of State government. It is of the utmost importance in seeking to determine the reach of the Commissioner's powers that this crucial distinction be recognized.

The majority concludes that Commissioner Sagner was obliged to accept his predecessor's determination as to the eligibility of Trap Rock to bid on highway contracts. This seems to me wrong in two respects. In the first place I would hold — generally speaking — that an incoming Commissioner of Transportation should *not* be bound by a determination of this sort made by his predecessor. Secondly, in the case before us there was so much new evidence presented to Commissioner Sagner that had not been before his predecessor at the earlier hearing, that there was no place for principles of *res judicata* or collateral estoppel to play any part in the decision.

As I have pointed out, the Commissioner of Transportation in our form of state government is a principal executive. He normally assumes his position upon the accession to office of a new gubernatorial administration. His is in certain respects a political position and the occupant of the office holds cabinet rank. Surely it is salutary and in the public interest to accord such an incoming official great freedom of action and choice, restrained only by the obvious caveat that his decisions be neither arbitrary, capricious nor patently unfair. For instance he should be at liberty to demand, should he think it in the public interest, that higher standards be met by a candidate for prequalification status than had previously been required. *N. J. S. A.* 27:7–35.3. And if such action should result in eliminating persons then presently qualified, this should not, in and if itself, be deemed sufficient reason to invalidate the stricter standards, or to

require their relaxation. The point here is that a chief task and responsibility of any principal executive officer in our State government is to formulate policy. The formulation of policy is a fluid process. Constricting the freedom with which policy is to be determined will seldom be in the public interest. To protect and further the public interest is, as this Court's opinion in the first *Trap Rock* case so strongly emphasized, the sole aim and purpose of the qualification and bidding procedures.

As I have tried to make clear, the Department of Transportation is not an administrative agency. Admittedly, when it holds hearings, these must be undertaken in full compliance with the provisions of the Administrative Procedure Act, *N. J. S. A.* 52:14B-2. But this obligation to comply with procedural safeguards when conducting departmental hearings does not transform an executive office into an administrative tribunal, nor does it in any way subtract from the substantive powers and responsibilities of that office. The prevailing opinion relies to some considerable extent upon an application of the doctrine of *res judicata* or collateral estoppel. Even were we dealing with a true, full-fledged administrative agency, the applicable law, as that opinion correctly concedes, does not *mandate* automatic resort to these doctrines. In *Lubliner v. Board of Alcoholic Beverage Control,* 33 *N. J.* 428 (1960) this Court, speaking through Justice Jacobs, dealt comprehensively with the question as to the extent that these doctrines should find place in the administrative process. Noting with approval the views of Professor Davis, 2 *Administrative Law* § 18.03, p. 559, Justice Jacobs concluded that these rules should neither be absolutely accepted nor absolutely rejected, but should be employed selectively as justice might require. 33 *N. J.* at 437-8. In determining when resort should be had to *res judicata* or any other like rule, it would seem important to study the needs unique to each particular case. Prominent among the factors that might be given weight in deciding whether these rules of repose should be applicable to the actions of the

Department of Transportation is what Professor Davis has referred to as "the importance of administrative freedom to reformulate policy." 2 Davis, *supra*, § 18.09, p. 607. To bind the hands of an incoming official, so that he must refrain from taking action that he, quite understandably, conceives to be in the public interest, seems to me most unfortunate. I would accordingly hold, at least as a general proposition, that the doctrines of *res judicata* and collateral estoppel may not be invoked to frustrate the decision-making process of this essentially executive entity.

Even were one to accept the doctrines of *res judicata* and collateral estoppel as applicable to the Department of Transportation, the factual pattern here would not justify their invocation. Commissioner Sagner had before him a quite different case than that presented to Commissioner Kohl. In the first place he was faced with the important fact that Trap Rock had pleaded guilty to and been convicted of the serious charge of having filed a false and fraudulent federal income tax return. Compare this with the factual situation which we determined justified suspension in the first *Trap Rock* case. Upon the earlier occasion an officer — albeit the real *alter ego* — of the corporation had merely been *indicted*. Here the corporation *itself* has been *convicted*. In the course of his comprehensive and well-reasoned Determination, Commissioner Sagner called attention to the following items of evidence which had *not* been presented to his predecessor at the earlier reinstatement hearing.

1. At all times following the divestiture by Michael J. Stavola, Trap Rock had rented at least 50% of its equipment from Delaware River Land Co., a corporation wholly owned by Stavola. At the reinstatement hearing in June, 1973 the rentals paid to Stavola were said to be fair and competitive. They were never revised upward. Hence at the later hearing the Commissioner determined that this raised an inference, which had not been rebutted, "that current rentals are below those currently available in the market place."

2. Land around certain quarries, as well as land upon which the principal office of Trap Rock is located, were also rented from Stavola or his wholly owned corporation. There had been no upward adjustment in rentals, thus inducing the same conclusion as set forth in (1) above.

3. The same person who had been the independent accountant for Trap Rock at the time of the reinstatement hearing was still serving in this capacity at the time of the later hearing. He also continued to act as accountant for the new corporation which now owns all the shares of Trap Rock, for the two sons of Michael J. Stavola, who own all the shares of the new corporation, for Michael J. Stavola, individually, for Delaware River Land Co. and for various other enterprises of Michael Stavola. The Commissioner characterized him as "a link in the chain of continuity between the Trap Rock Industries, Inc. which was controlled by Michael J. Stavola and the present Trap Rock Industries, Inc." He was also the accountant who prepared and signed the corporate tax return which was the basis for the indictment and conviction of Trap Rock in September, 1974.

4. A person named Ms. Melville Keever first became a director of Trap Rock in 1971 and continued in this capacity until the time of the later hearing. She was also assistant secretary and treasurer. She had been associated with Michael Stavola for more than ten years. Her salary at the time of the hearing in September, 1974 was paid either by Delaware River Land Co. or by some other entity controlled by Michael Stavola. Commissioner Sagner concluded that "[n]one of this evidence before me rebuts the inference that Ms. Keever is Michael J. Stavola's nominee on the Board of Directors of Trap Rock Industries, Inc."

In the light of the foregoing how can it be said that Commissioner Sagner should be bound by the determination of his predecessor? Noting these facts, and recalling that the separation of Michael J. Stavola from the corporation was accomplished by an entirely intra-family transfer of stock, only a small portion of the purchase price for which

has actually been paid, how can it be said that there had, indeed, been a divestiture in any real sense?

The prevailing opinion places great weight upon the fact that Michael J. Stavola, who apparently was chiefly responsible for the filing of the false income tax return, is no longer associated with the corporation. It quotes from our earlier opinion, 59 *N. J.* at 482, to the effect that the moral responsibility of the individuals who give direction to a corporation is to be equated with the moral responsibility of the corporation itself. It then concludes that where the corporate entity has purged itself of the offending individuals, the responsibility of the corporation should thereafter be tested, not by the moral infirmities of the departed evildoers, but by the integrity of those who remain in control. The argument is being asked to carry a greater weight than it can bear. Of course purification and penance are salutary, but they cannot safely be deemed the sole key to ultimate salvation in so sensitive an area as this. The sting of punishment is important and has been so recognized by the Legislature. Furthermore, were it possible to obtain corporate absolution simply by the expulsion of the wrongdoer, it would take little imagination to perceive that public protection had been massively eroded.

Finally, the Commissioner's ruling should have been sustained as being supported by sufficient credible evidence in the record.

For the foregoing reasons I would reverse the decision of the Appellate Division and reinstate the Determination of the Commissioner of Transportation. Justices CLIFFORD and SCHREIBER join in this opinion.

*For affirmance*—Justices SULLIVAN and PASHMAN and Judge CONFORD—3.

*For reversal*—Justices MOUNTAIN, CLIFFORD and SCHREIBER—3.