**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1088-14T2

IN RE CAFRA PERMIT NO.
1512-08-0020.1CAF080001
RAILROAD AVENUE, LACEY
TOWNSHIP, OCEAN COUNTY,
NEW JERSEY.

_____

Argued September 20, 2016 — Decided March 29, 2017

Before Judges Koblitz, Rothstadt and Sumners.

On appeal from the Department of Environmental
Protection.

Edward Lloyd argued the cause for appellants
The Sierra Club, Lacey Rail Trail
Environmental Committee, Save Barnegat Bay,
and The American Littoral Society (Columbia
Environmental Law Clinic, Morningside Heights
Legal Services, Inc., attorneys; Mr. Lloyd and
Susan J. Kraham, on the briefs).

Timothy P. Malone, Deputy Attorney General,
argued the cause for respondent New Jersey
Department of Environmental Protection
(Christopher S. Porrino, Attorney General,
attorney; Melissa H. Raksa, Assistant Attorney
General, of counsel; Mr. Malone, on the
brief).

Jared J. Monaco argued the cause for
respondent Township of Lacey (Gilmore &
Monahan, P.A., attorneys; Mr. Monaco, of

counsel and on the brief; Michael S. Nagurka, on the brief).

PER CURIAM

Respondent, the New Jersey Department of Environmental Protection (DEP), issued a Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, permit to respondent Township of Lacey (Lacey) after denying two prior applications for the same permit. Lacey needed the permit for construction of a roadway and an adjacent bike and pedestrian path on an abandoned railroad right of way (ROW). The proposed roadway is intended to help alleviate traffic on Route 9 and the bike/pedestrian path is intended to be incorporated into an existing Ocean County recreational trail that traverses several towns.

Appellants, Lacey Rail Trail Environmental Committee (LRTEC), The Sierra Club, Save Barnegat Bay, and the American Littoral Society, argue that the DEP's decision to issue the permit constitutes an unexplained summary reversal of the DEP's earlier denials, a failure to recognize the subject property as public open space, and that the proposed project does not comply with CAFRA and related regulations. They also contend that in reaching its decision, the DEP engaged in impermissible rulemaking. Moreover, they argue that the DEP's findings were unsupported by the evidence. We disagree and affirm.

The DEP issued the permit to Lacey, "authoriz[ing] the construction of a new 1.9 mile bypass road . . . within the former Barnegat Branch Railroad [ROW]." The proposal for the new road, designated as Railroad Avenue, included two vehicle lanes, with an additional right-turn lane at one intersection, and a pedestrian and bike path, separated from the roadway by a two-foot landscaped buffer. It is considered a bypass road because it connects Lacey Road to South Street and runs parallel to State Highway Route 9, for the purpose of "alleviat[ing] traffic congestion" on Route 9 "by providing an alternate route for local traffic."

The DEP's approval included a condition that no new curb cuts shall be permitted, so that there would be no additional development along the roadway. It also recognized that limited clearing of vegetation would be necessary, but it required re-vegetation of portions of the area and installation of vegetation buffers as additional conditions.

The DEP's decision to issue the permit for Railroad Avenue's construction was reached after many years of consideration. The approved project represented a change from earlier proposals made in 2006 and 2009 in that it reduced the length of the roadway and excluded certain areas as suggested by the DEP.

The creation of the bypass road represents a substantial change from the ROW's historical use by the public. The area was

originally part of an approximately fifteen-mile railroad right-of-way in Ocean County, known as the Barnegat Branch Railroad ROW owned by the Central Railroad of New Jersey. The railroad abandoned the ROW in 1973 and since then the railroad ties and tracks located within the ROW were removed. The ROW has been used by the public as a walking, jogging, and bike trail.

Lacey acquired a 4.8 miles long and fifty feet wide portion of the ROW through a 1993 tax foreclosure action. It did not dedicate the area as open public space, but instead intended to construct the roadway to help alleviate congestion on Route 9. Other than keeping the ROW's intersection with other roadways clear for traffic safety reasons, Lacey did not maintain the portion of the ROW it acquired by mowing, clearing, or otherwise improving the property.

In May 2004, Lacey granted Ocean County a twelve-foot-wide easement along the western edge of the ROW for construction of a bike path. The following month, the County passed an ordinance authorizing "the design, permitting, and construction of a recreational [15.6 mile] trail project" through five municipalities "to be known as the Barnegat Branch Trail." The county's plan for the portion located in Lacey was limited to a seven-foot-wide trail throughout the entirety of the fifty-foot-wide area owned by Lacey.

A-1088-14T2

Beginning in 2005, Lacey sought approval from the DEP to develop a portion of the ROW as a roadway. In March, the DEP issued Lacey a permit authorizing the construction of a 1700-foot (.32-mile) portion of Railroad Avenue in connection with the anticipated construction of a nearby senior housing project. In accordance with this permit, a 950-foot portion of Railroad Avenue was constructed between South Street and Laurel Boulevard before the permit expired. In April 2006, the DEP denied another application by Lacey for a permit to construct a .82-mile portion of Railroad Avenue between Lacey Road and Musket Road/First Street. The DEP denied the permit application after finding the proposed construction failed to comply with certain Coastal Zone Management Rules (CZM Rules) — including those relating to public open space, N.J.A.C. 7:7E-3.40; location of linear development, N.J.A.C. 7:7E-6.1; basic location, N.J.A.C. 7:7E-6.2; secondary impacts, N.J.A.C. 7:7E-6.3; and buffers and compatibility of uses, N.J.A.C. 7:7E-8.13.[1] The agency found the proposal also failed to satisfy three of the criteria set forth in CAFRA Section 10, N.J.S.A. 13:19-10 — specifically, subsections (e), (f), and (g) — though it found Lacey satisfied the remaining Section 10 criteria.

---

[1] Each of the regulations relied upon by the DEP in response to the relevant permit applications were recodified, without significant amendment, effective July 6, 2015. 47 N.J.R. 1392(a).

Lacey applied for the CAFRA permit at issue and for a Freshwater Wetlands Transition Area Waiver in September 2008. The application sought permission to construct a 2.21-mile road "within [the] former Barnegat Branch railroad [ROW]" that would connect Route 9 to Lacey Road. The DEP accepted comments for a thirty-day period. Those opposed to the proposal argued that the ROW "should become a linear greenway for pedestrian and bicycle access linking adjacent Townships." Those in favor argued the proposed roadway would alleviate traffic on the parallel stretch of Route 9, "support better response times for emergency responders, provide an alternative evacuation route in an emergency, and increase safe access to a local school and church."

The DEP denied the application without prejudice in March 2009, after finding the proposed construction failed to comply with several CZM Rules, including those pertaining to public open space, N.J.A.C. 7:7E-3.40; location of linear development, N.J.A.C. 7:7E-6.1; basic location, N.J.A.C. 7:7E-6.2; secondary impacts, N.J.A.C. 7:7E-6.3; and buffers and compatibility of uses, N.J.A.C. 7:7E-8.13. However, the DEP found the proposal satisfied the criteria set forth in N.J.S.A. 13:19-10.

Lacey appealed the denial of the permit, requesting an adjudicatory hearing. The matter was referred to the Office of Administrative Law. Prior to a hearing, Lacey and the DEP entered

into settlement discussions that resulted in Lacey submitting revised plans and related information for the project. The additional information included revised traffic studies and related proposals. Based on those revised plans, Lacey and the DEP executed a stipulation of settlement (Stipulation) on August 3, 2010, and Lacey withdrew its hearing request without prejudice.

The DEP published notice of its intent to issue the permit in its August 18, 2010 bulletin and accepted public comments until November 8, 2010. By the end of the comment period, the agency had received over 600 comments, which "generally addressed concerns with the need for the project, stormwater impacts, potential impacts to wetlands, category one waters, special water resource protection areas, public open space, and the condemnation of a single family home." The comment submitted by the LRTEC argued the DEP was required to deny the permit because the deficiencies found in the earlier application had not been remedied.[2]

In its January 11, 2012 bulletin, the DEP published notice of its intent "to issue [the] CAFRA permit with a hardship exception for a Special Water Resources Protection Area (SWRPA)." During the public comment period, the DEP received approximately

_____

[2] On March 30, 2011, Lacey and the DEP executed an addendum to the Stipulation.

128 comments, which largely raised the same concerns raised in response to the DEP's initial notice of intent to issue the permit.

After concerns were raised that the project would have a negative impact on the freshwater wetlands in the Oak Bluff Avenue portion of the ROW, the DEP suggested Lacey "further consider and more closely evaluate" an alternative that "would relocate the northern terminus of the project" to alleviate the concern. In response to the DEP's suggestion, Lacey submitted a revised plan that modified the proposed roadway to avoid the Oak Bluff Avenue area, thereby reducing its length to 1.9 miles. The DEP published notice of its intent to issue the CAFRA permit in its July 24, 2013 bulletin, explaining the relation to the earlier Stipulation and the revisions made to the plans and accepted public comments.

On October 16, 2014, the DEP issued Lacey the challenged permit and a fifty-five page Final Summary Report explaining its reasons for its action. In its Summary Report, the DEP analyzed the project's compliance with the relevant CZM Rules and the CAFRA Section 10 criteria, and found it fully complied with all rules and requirements provided Lacey complied with the special conditions imposed. Moreover, the DEP explained that the basis for its reconsideration of the earlier applications was the receipt

of additional information.[3]  Notice of the permit's issuance was published in the DEP's November 5, 2014 bulletin.  This appeal followed.

We begin by acknowledging that our "role in reviewing an administrative agency's final decision is limited." Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007) (citing In re Taylor, 158 N.J. 644, 656 (1999)). We will "reverse [an agency's final decision] only if [we] 'conclude[] that [its] decision . . . is arbitrary, capricious, or unreasonable, or is not supported by substantial credible evidence in the record as a whole.'" In re Adoption of Amendments to Water Quality Mgmt. Plans, 435 N.J. Super. 571, 582 (App. Div.) (alteration in original) (quoting J.D. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 521 (App. Div. 2000)), certif. denied, 219 N.J. 627 (2014). An agency's findings of fact "are considered binding on appeal when supported by adequate, substantial and credible evidence." Taylor, supra, 158 N.J. at 656 (quoting Rova Farms Resort, Inc. v. Inv'rs Corp., 65 N.J. 474, 484 (1974)). "The burden of demonstrating that the

---

[3]  These documents included a draft of Lacey's 1998 addendum to its Master Plan and a 2004 report relating to the reexamination of its master plan.  These documents indicate that Lacey did not intend to keep the property in its current condition, but rather called for the development of the roadway.

agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Adoption of Amendments to Water Quality Mgmt. Plans, supra, 435 N.J. Super. at 582 (alteration in original) (quoting In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div.), certif. denied, 188 N.J. 219 (2006)). We accord deference to a final agency action, and will not substitute our judgment for the expertise of an agency "so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable [or not supported by the record]." In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 593 (App. Div. 2004) (alteration in original) (quoting In re Distrib. of Liquid Assets, 168 N.J. 1, 10 (2001)).

Our "substantial deference [also extends] to an agency's interpretation and application of its own regulations, particularly on technical matters within the agency's special expertise." Pinelands Pres. All. v. N.J. Dep't of Envtl. Prot., 436 N.J. Super. 510, 524 (App. Div.), certif. denied, 220 N.J. 41 (2014). However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." US Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012) (quoting Univ. Cottage Club of Princeton N.J. Corp., supra, 191 N.J. at 48). "When 'the issue involves the interpretation of

statutes and regulations, it is a purely legal issue, which [is] consider[ed] de novo.'" Pinelands Pres. All., supra, 436 N.J. Super. at 524-25 (quoting Klawitter v. City of Trenton, 395 N.J. Super. 302, 318 (App. Div. 2007)).

Applying these standards, we turn first to appellants' contention that the DEP "erred as a matter of law" by failing to make specific findings of fact to support its conclusion that the proposed project complied with N.J.S.A. 13:19-10(e) and (f).[4] They argue the DEP, instead, "summarily recite[d] the statutory language of CAFRA, which does not amount to a finding of fact" and that "[t]his [c]ourt must reject the permit on this basis alone." Respondents argue that the Summary Report contains significant

---

[4]  N.J.S.A. 13:19-10 provides, in pertinent part:

> A permit may be issued pursuant to this act only upon a finding that the proposed development:
>
> . . . .
>
> e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.
>
> f. Is located or constructed so as to neither endanger human life or property nor otherwise impair the public health, safety, and welfare.

discussion of the facts underlying its findings with respect to N.J.S.A. 13:19-10(e) and (f), and that appellants improperly consider the agency's statement of its findings "in a vacuum, ignoring the preceding detailed and extensive Summary Report that provides the context for these findings."

When deciding whether to issue a CAFRA permit pursuant to N.J.S.A. 13:19-10, the DEP is required to consider whether the applicant satisfies the seven considerations listed in the statute. See N.J.S.A. 13:19-10 (a) — (g).

We conclude from our review that the DEP satisfied its obligation to "make findings under the standards in N.J.S.A. 13:19-10." In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 332 (App. Div. 2002). With respect to N.J.S.A. 13:19-10(e), the DEP stated in its Summary Report that it found that "[d]evelopment of the project as proposed would not interfere with the natural functioning of plant, animal, fish and human life processes." As to N.J.S.A. 13:19-10(f), the DEP found: "The project would not endanger human life or property. The [DEP] has determined that the project promotes public health, safety and welfare by providing a safe alternative for local travel trips." In reaching those conclusions, the DEP addressed issues regarding "[e]ndangered or threatened wildlife or plant species habitats" and issues of "public health, safety and welfare" in the Summary

Report. For example, the DEP found no evidence of any potential impact to threatened or endangered wildlife or plant species. The agency investigated claims of the project's potential for interfering with barred owl habitats and concluded there was no danger, nor did the area contain any marine fisheries, endangered or threatened species habitats or unique wildlife habitat. After considering the traffic studies and related information, the DEP found that the roadway would improve the quality of life for the residents by relieving traffic congestion. It made specific findings concerning the benefit of the project to public health and safety, noting the roadway would provide a safe alternative for travel along Route 9, while still allowing the benefits of a walking and bike trail as part of the county's Barnegat Branch Trail.

Appellants next argue the DEP's issuance of the permit must be reversed because, in finding the proposal complied with the rules regarding public open space, N.J.A.C. 7:7E-3.40, and secondary impacts, N.J.A.C. 7:7E-6.3, the DEP "applied previously unannounced administrative standards" for determining whether a property would be considered open space. They contend the new standards were the product of rulemaking, requiring notice and comment prior to their application, because they were "not clearly inferable from the applicable regulatory provision[s] or enabling

legislation," did not "reflect a policy previously expressed by the agency," and lacked any "indication that [they would] not apply generally and uniformly to similarly situated persons seeking CAFRA permits in the future." Respondents argue that appellants' contention fails to appreciate the distinction between the agency considering a variety of factors to make its finding and setting new standards for information it will consider in making a determination.

"The [Administrative Procedure Act (APA)] defines an administrative rule as an agency's 'statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements' of the agency." In re Authorization for Freshwater Wetlands Statewide Gen. Permit 6, 433 N.J. Super. 385, 413 (App. Div. 2013) (quoting N.J.S.A. 52:14B-2(e)). "Prior to adopting or amending any rule, an administrative agency must give notice of its intended action and afford interested parties a 'reasonable opportunity to submit data, views or arguments, orally or in writing.'" Univ. Cottage Club of Princeton N.J. Corp., supra, 191 N.J. at 53 (citation omitted) (quoting N.J.S.A. 52:14B-4(a)(3)).

In evaluating whether an agency's determination announces a rule triggering the notice requirement, courts consider whether the determination:

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 331-32 (1984).]

"The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule." In re Provision of Basic Generation Serv., 205 N.J. 339, 350 (2011).

With respect to the public open space rule, N.J.A.C. 7:7E-3.40,[5] appellants contend the DEP "announce[d] four new standards

_____

[5] The rule in effect at the time the permit was issued defined public open space as:

land areas owned or maintained by State, Federal, county and municipal agencies or private groups . . . and used for or dedicated

15

A-1088-14T2

for [determining] what constitutes 'public open space:'" (1) "the 'purpose' for which the land is acquired"; (2) whether the land is "designated as 'a Suburban Planning Area'" rather than "'a park of natural area' on the State Development and Redevelopment Plan Map"; (3) whether the land is "'list[ed] on the Protected Open Spaces System Map' or 'in the County Recreation and Open Space Inventory'"; and, (4) whether the land is "'identified as an acquired property on the Ocean County Natural Lands Trust website'" or was purchased with funds from the Ocean County Natural Lands Trust (the County Lands Trust).

The DEP argues, with respect to "standards" two and three, that the land's status in the referenced documents was not a new standard, as the documents were merely considered "as factors which supported Lacey's position that the ROW was not intended to be public open space." As to the fourth "standard," the DEP argues that "whether land is held by the New Jersey Natural Lands Trust is expressly a consideration in N.J.A.C. 7:7E-3.40(a)" and that

to conservation of natural resources, public recreation, visual or physical public access or, wildlife protection or management. Public open space also includes, but is not limited to . . . lands held by the New Jersey Natural Lands Trust . . . and designated Natural Areas within DEP-owned and managed lands.

[N.J.A.C. 7:7E-3.40(a) now codified at N.J.A.C. 7:7-9.38.]

16                                                    A-1088-14T2

it "addressed whether Natural Lands Trust funds were used to acquire the ROW or easement in response to public comments regarding the use of these funds."

Lacey argues the first "standard" was not a new standard because "a plain reading of the [public open space rule] indicates that purpose [for which the land is acquired] is already an enumerated standard." As to the remaining "standards," Lacey argues they were simply some of many factors considered in finding that the land was not public open space, and therefore not newly announced standards.

We do not discern from the record that the DEP engaged in rulemaking when it determined the subject property was not public open space. In its Summary Report, the DEP relied on its regulation for the definition and concluded the land was not public open space after finding it was purchased by Lacey "for the purpose of constructing the road project" and "was not purchased or dedicated for conservation, public recreation, public access, or wildlife protection." The DEP noted that "the site [wa]s not designated as a park or natural area" on the State Development and Redevelopment Plan Map, rather as a Suburban Planning Area. Moreover, the site was not listed as a protected open space on the county's Protected Open Spaces System Map, "not identified as open space in the County Recreation and Open Space Inventory," not

17

identified as having been acquired by the County Lands Trust, and was not purchased with any money from that trust. It also stated that the County "never envisioned a [fifty-foot] wide multi-use trail in Lacey," noting that the proposal was consistent with the County's 2007 Barnegat Branch Trail Conceptual Plan, which envisioned a seven-foot-wide trail for pedestrians and cyclists separated by a buffer from a thirty-eight-foot-wide roadway.

We view the appellants' argument that these findings amounted to the DEP imposing new standards in its determination of whether the ROW constituted public open space to be without merit. The first three considerations complained of were relevant considerations to the determination of whether the ROW was public open space, as they speak to whether the land was "used for or dedicated to conservation of natural resources, public recreation, visual or physical public access or, wildlife protection or management." N.J.A.C. 7:7E-3.40(a). As for the fourth consideration, the definition of public open space clearly contemplates the land's relationship to the land trusts, as it includes in its definition of public open space "lands held by the New Jersey Natural Lands Trust." Ibid.

The DEP's consideration of these four factors did not qualify as rulemaking. See Metromedia, supra, 97 N.J. at 331-32. There is no indication they are "intended to have wide coverage[,]

18

. . . be applied generally and uniformly," or apply only prospectively. Id. at 331. To the extent they could be considered a legal standard, they are "clearly and obviously inferable" from the public open space rule, see N.J.A.C. 7:7E-3.40(a). To the extent they could be considered as representing an administrative policy, there is nothing indicating they have never been considered before or are a "material and significant change from a clear, past [DEP] position" on what constitutes public open space. Metromedia, supra, 97 N.J. at 331. Finally, there is nothing to suggest these considerations "reflect[] a decision on administrative regulatory policy in the nature of the interpretation of law or general policy." Id. at 331-32.

We turn next to appellants argument that, in finding the proposal satisfied the secondary impacts rule, N.J.A.C. 7:7E-6.3,[6]

---

[6] The rule regarding secondary impacts defines them as "the effects of additional development likely to be constructed as a result of the approval of a particular proposal." N.J.A.C. 7:7E-6.3(a). The regulation also states:

> Secondary impact analysis must include an analysis of the likely geographic extent of induced development, its relationship to the State Development and Redevelopment Plan, an assessment of likely induced point and non-point air and water quality impacts, and evaluation of the induced development in terms of all application Coastal Zone Management rules.
>
> [N.J.A.C. 7:7E-6.3(b)(2) now codified at N.J.A.C. 7:7-14.3.]

A-1088-14T2

the DEP "announce[d] a new administrative standard": whether the land is "inclu[ded] in the State Development and Redevelopment Plan as a Suburban Planning Area."  Respondents argue the land's designation as a Suburban Planning area was not a new standard, but rather a factor considered in determining what secondary impacts the proposed roadway would have.

We again conclude the DEP did not engage in rulemaking in reaching its decision to issue the CAFRA permit to Lacey.  In finding that the proposal complied with the secondary impacts rule, the DEP considered that the proposed road "traverses an area of Lacey Township that consists primarily of residential and commercial development," that "the site is designated a Suburban Planning Area according to the State Development and Redevelopment Plan," and that, according to information provided by Lacey, the surrounding area was already largely developed, such that "the proposed roadway will not induce further development."  The DEP also considered that conditions imposed on the permit would prevent construction of "additional future points of ingress/egress to the new roadway" and that the proposal's inclusion of a trail for pedestrians and cyclists made the project "consistent with" the County's Barnegat Branch Trail Conceptual Plan.

The DEP's consideration of the land's "inclusion in the State Development and Redevelopment Plan as a Suburban Planning Area"

did not impose a new standard, thereby constituting rulemaking. First, the text of the secondary impacts rule requires the DEP to consider the property's "relationship to the State Development and Redevelopment Plan," N.J.A.C. 7:7E-6.3(b)(2), so it cannot be said that considering the site's designation as a Suburban Planning Area under that plan was a newly announced standard. Moreover, there is nothing to suggest the site's designation was determinative, or even the most significant factor in the DEP's finding, and the DEP expressly considered several other factors. Even if the DEP's consideration of the site's designation satisfied the first three or final Metromedia factors, the fact that the text of the secondary impacts rule required the DEP to consider its designation prevents the DEP's consideration from meeting the fourth and fifth criteria, and greatly outweighs the remaining factors. See Metromedia, supra, 97 N.J. at 331-32; In re Provision of Basic Generation Serv., supra, 205 N.J. at 350. The DEP imposed no new standards for the public open space and secondary impacts rules, and thus did not engage in improper rulemaking.

Appellants next contend the DEP's decision to issue the permit was arbitrary and capricious, as it was an "[u]nexplained, summary reversal[]" of its 2006 and 2009 decisions to deny a similar permit and the findings underlying those denials, and was "unsubstantiated by and contrary to the evidence." They claim the

DEP failed to explain its bases for finding that the requirements it had previously found unsatisfied were fulfilled by the new proposal. Appellants specifically cite to the DEP's different determinations as to N.J.S.A. 13:19-10(e), (f), and (g), and the rules regarding public open space, N.J.A.C. 7:7E-3.40; location of linear development, N.J.A.C. 7:7E-6.1; basic location, N.J.A.C. 7:7E-6.2; secondary impacts, N.J.A.C. 7:7E-6.3; and buffers and compatibility of uses, N.J.A.C. 7:7E-8.13. We disagree.

We are satisfied the DEP properly exercised its right to consider and grant the revised 2009 application because it explained its reasons for its divergent opinions. "In the absence of some legislative restriction, administrative agencies have the inherent power to reopen or to modify and to rehear orders that have been entered." In re Van Orden, 383 N.J. Super. 410, 419 (App. Div. 2006) (quoting Burlington Cty. Evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579, 600 (1970)). However, in doing so, an agency is not "free to disregard completely issues that were fully and fairly resolved" in its earlier decision. Trap Rock Indus., Inc. v. Sagner, 133 N.J. Super. 99, 110 (App. Div. 1975), aff'd by an equally-divided court, 69 N.J. 599 (1976). "The power to reconsider must be exercised reasonably, with sound discretion reflecting due diligence, and for good and sufficient cause." Ibid. Thus, in determining whether to reconsider a prior

determination, an agency should "balance[e] . . . such factors as new developments or even new evidence of old developments, the advantages of repose, party reliance, the thoroughness of the earlier decision and the showing of illegality, fraud, mistake and the like."  Ibid.

Here, although the DEP's 2014 decision was effectively a reconsideration of its 2006 and 2009 denials, the approved application was a "new application," N.J.S.A. 13:19-15; N.J.A.C. 7:7-4.9(b) (now codified at N.J.A.C. 7:7-26.9), that the DEP granted based upon its recognition of its own error, new information and revised plans.  Nevertheless, because the DEP reached different conclusions in its findings as to Lacey's compliance with particular requirements and in its ultimate decision on the application, the DEP was required to express its reasons for the divergence, though it need not have been explained in those terms.  See Pinelands Pres. All., supra, 436 N.J. Super. at 532-33.

We conclude that the DEP satisfied its obligation to explain its reasons for granting Lacey the CAFRA permit in 2014 when it had previously denied similar applications.  Contrary to appellants' argument, the DEP was not required to expressly rebut its previous findings, but had to consider the most recent application anew and provide an adequate explanation for its

findings with respect to the specific application. Nevertheless, we address the various contentions as to each of the DEP's considerations serially and compare them to the DEP's earlier determinations.

In 2006, the DEP found the requirements of Section 10(e) were not satisfied because the project "would effectively block the County['s] . . . ability to convert the [ROW] to a passive/active car free recreational use, and would also result in loss of the values and functions the abandoned rail line has started to provide, such as a vegetative buffer and wildlife habitat." In 2014, the DEP found the revised project "would not interfere with the natural functioning of plant, animal, fish and human life processes." The agency also determined that the project satisfied N.J.S.A. 13:19-10(e) because it would cause only "minimal feasible interference." Although the agency discussed its findings while addressing the rule on location of linear development, N.J.A.C. 7:7E-6.1 and the supporting evidence, its considerations applied equally to its determination of Lacey's compliance with N.J.S.A. 13:19-10(e). Although the project would require the clearing of vegetation along the ROW "[t]he project [was] designed to minimize the vegetation disturbance to maximize the buffering between the proposed road and the existing residential developments." It also found that the project would have "minimal feasible interference"

24                                                          A-1088-14T2

with endangered or threatened wildlife and with SWRPA vegetation. It explained that these conditions were different from the prior application due to revisions to the earlier design that resulted in the elimination of a "segment of the road" and a change to its terminus.

Addressing N.J.S.A. 13:19-10(f), in 2006, the DEP found the project would not promote the public welfare, as it was "in close proximity to existing homes[,] . . . would not offer a car free pedestrian transportation link between the [five municipalities], and . . . serv[ed] only to promote higher vehicle miles as opposed to promoting recreational uses such as biking and walking." It also noted that the ROW had "developed into a naturally vegetated buffer to houses along the [ROW], a linear wildlife corridor and a car free public open space providing a human powered linkage amongst five municipalities." In 2014, the agency found it used an improper definition of public space, and applying the correct definitions, found Lacey's revised proposal "promotes public health, safety and welfare by providing a safe alternative for local travel trips," and "would not endanger human life or property." Relying on revisions to the plans and new traffic studies, it found that the project would "provid[e] a safe alternative for local travel trips," and by its earlier findings

that the project would allow for "enhanced emergency access" in the area and would "not impact private or public property."

Turning to appellants' argument about the DEP's decision regarding N.J.S.A. 13:19-10(g),[7] they contend that the DEP failed to explain its basis for finding the proposal complied with the provision after determining earlier that it did not and that the DEP's finding of compliance was the result of its reliance upon its incorrect determination that the ROW did not constitute public open space. We disagree.

In 2006, the DEP found the project did not satisfy the statutory criteria because it "would greatly reduce" the ROW's function as a "vegetative buffer area between the existing residential properties on the west and the commercial properties on the east." In 2014, the DEP found "[t]he project will not impact unique or irreplaceable land types, historical or archeological areas, or existing public scenic attributes." In so finding, it cited its determination that the site was not public open space, did not contain any historic properties, and the New Jersey Historic Preservation Office's view that "the project will have no effect on historic properties and . . . that there is no

_____

[7]    N.J.S.A. 13:19-10(g) states that a permit be issued only if the DEP finds the proposal "[w]ould result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing public scenic attributes at the site and within the surrounding region." N.J.S.A. 13:19-10(g).

need for further culture resource consideration within the project area."  The DEP's finding that the project satisfied N.J.S.A. 13:19-10(g) was also supported by its earlier finding that the project would not cause "permanent or long-term loss of any unique or irreplaceable areas" and the evidence supporting that finding and by the information cited regarding the absence of any historical areas in the project area.

Next, appellants argue that the agency failed to adequately explain its current finding that the proposal complied with the public open space rule, N.J.A.C. 7:7E-3.40,[8] when it found the

<hr>

[8]    The public open space rule in effect at the time of the permit decisions provided, in relevant part:

> (a)  Public open space constitutes land areas owned or maintained by State, Federal, county and municipal agencies or private groups . . . and used for or dedicated to conservation of natural resources, public recreation, visual or physical public access or, wildlife protection or management.  Public open space also includes, but is not limited to . . . lands held by the New Jersey Natural Lands Trust . . . and designated Natural Areas within DEP-owned and managed lands.
>
>        . . . .
>
> (c)    Development that adversely affects existing public open space is discouraged.
>
> (d)  Development within existing public open space is conditionally acceptable, provided that the development is consistent with the character and purpose of public open space,

27

rule was not satisfied in 2006 and 2009. They further argue there is no support for the DEP's claim that Lacey purchased the ROW for the purpose of constructing a roadway. They contend that the area's "actual use" as recreational space for decades established the public use required by the rule. Moreover, appellants argue that the DEP's determination that the ROW was not public open space was not supported by the ROW's designation as a Suburban Planning Area, exclusion from the Protected Open Spaces System Map and the County Recreation and Open Space Inventory, or its independence from the County Lands Trust.

The DEP found in 2006 and 2009 that the ROW "ha[d] been serving as public open space since its abandonment in 1973 and [that use] was further enhanced by the removal of tracks and railroad ties," and that "[s]ite inspections . . . revealed use by local citizens as evidenced by tracks left by walkers/joggers and bike tires." It further noted that the County had "[recognized] the value of the [ROW] as public open space by passing [an ordinance] for development of a multi[-]use trail [fourteen] miles long," serving the five municipalities through which the ROW passed, and that using the full width of the ROW for

as described by the park master plan when such a plan exists.

[N.J.A.C. 7:7E-3.40 now codified at N.J.A.C. 7:7-9.38.]

the trail "has the potential of providing a safe car free environment to thousands of various users." While the DEP acknowledged that the proposed road would "divert some locally generated traffic away from Route 9," it found those benefits would not be "significant enough to improve [the] existing poor conditions on this section of Route 9." It concluded that, because it was "not able to find that the construction of the project as proposed [would] not result in an adverse impact to existing public open space," Lacey failed to demonstrate compliance with the public open space rule.

In granting the permit in 2014, the DEP concluded that Lacey had demonstrated compliance with the rule, finding that the ROW did not constitute public open space and that the proposed road would "not adversely affect existing public open space" and would in fact expand public open space in Lacey. In so concluding, the DEP began by acknowledging that its initial decision on the application "found that the proposed roadway would result in the loss of open space," but that it was "reconsider[ing] its prior finding" based upon information that "was not provided and/or considered at the time of the original permit review." It explained that the land was purchased by Lacey "for the purpose of constructing the road project" and "was not purchased or dedicated for conservation, public recreation, public access, or

wildlife protection," and concluded the land "[t]herefore . . . is not considered public open space." The DEP further noted that the ROW was "not designated as a park or natural area" on the State Development and Redevelopment Plan Map, rather as a Suburban Planning Area, was not listed as a protected open space on the county's Protected Open Spaces System Map, was "not identified as open space in the County Recreation and Open Space Inventory," was not identified as having been acquired by the County Lands Trust, and was not purchased with any money from the trust. The agency further stated that the County "never envisioned a 50-foot wide multi-use trail in Lacey," noting that the proposal was consistent with the County's 2007 Barnegat Branch Trail Conceptual Plan, which envisioned a seven-foot-wide trail for pedestrians and cyclists separated by a buffer from a thirty-eight-foot-wide roadway.

Significantly, there was no evidence that Lacey took any steps to support or encourage the public's use of the ROW as a pedestrian and bike trail beyond the alleged removal of railroad tracks and ties[9] — for example, by pruning trees, removing debris, clearing vegetation, or otherwise maintaining the ROW. <u>Compare</u>

---

[9]    It is not clear whether Lacey undertook the removal. The removal would be necessary in any event for the construction of a roadway and the adjacent walking and bike paths.

<u>Cedar Cove v. Stanzione</u>, 122 <u>N.J.</u> 202, 216-18 (1991) (finding appropriate application of the Green Acres Land Acquisition and Recreation Opportunities Act, <u>N.J.S.A.</u> 13:8A-35 to -55, where a municipality encouraged the public's use of property for recreational purposes and maintained property for that purpose). The DEP recognized, however, the public's unofficial use of the property for those purposes and considered Lacey's plan for the construction of a "pedestrian/bike trail" as one of the intended uses, to be consistent with the use made of the ROW by the public. Under these circumstances, the DEP correctly determined that the entire property was not "dedicated to" public use, or "used for" those purposes by the public with Lacey's facilitation or participation. What use the public made of the land could continue after the project.

Appellants also argue that the DEP failed to adequately explain why it found the proposal complied with the rule on location of linear development, <u>N.J.A.C.</u> 7:7E-6.1,[10] when it found

---

[10] A "linear development" is "a development with the basic function of connecting two points, such as a road, drive, public walkway, [or] railroad." <u>N.J.A.C.</u> 7:7E-1.8 (now codified at <u>N.J.A.C.</u> 7:7-1.5). The rule on location of linear development in effect at the time of the permit decisions provides, in relevant part:

> (a) A linear development, as defined at <u>N.J.A.C.</u> 7:7E-1.8, shall comply with the specific location rules to determine the most acceptable route, to the maximum extent practicable. If part of the proposed

31

the rule was not satisfied in 2006 and 2009. Specifically, they argue that because many of the proposal's attributes cited by the DEP in finding the rule was satisfied were not part of the earlier applications or relied upon in those applications' denials, they cannot justify the DEP's change in position.

---

alignment of a linear development is found to be unacceptable under the specific location rules, that alignment (perhaps not the least possible distance) may nonetheless be acceptable, provided the following conditions are met:

1.   There is no prudent or feasible alternative alignment which would have less impact on sensitive areas and marine fish or fisheries as defined at N.J.A.C. 7:7E-8.2;

2.   There will be no permanent or long-term loss of unique or irreplaceable areas;

3.   Appropriate measures will be used to mitigate adverse environmental impacts to the maximum extent feasible, such as restoration of disturbed vegetation, habitats, and land and water features; and

4.   The alignment is located on or in existing transportation corridors and alignments, to the maximum extent practicable.

[N.J.A.C. 7:7E-6.1 now codified at N.J.A.C. 7:7-14.1.]

A-1088-14T2

In 2006 and 2009, the DEP found that the ROW had been serving as public open space, and found that the proposed construction "would effectively block the [County's] ability to convert the [ROW] to a passive/active car free recreational use and would also result in loss of the values and functions the abandoned rail line ha[d] started to provide, such as a vegetative buffer and wildlife habitat." As "the construction of the project would result in a permanent loss of a unique and irreplaceable area," the DEP found Lacey's proposals had failed to demonstrate compliance with this rule.[11]

In the 2014 Summary Report, the DEP began by acknowledging that it was reconsidering its prior findings and concluded that the proposal was now in compliance with the rule on linear development. In doing so, it first noted that the revisions eliminated the Oak Bluff Avenue portion of the road, thereby "eliminat[ing] any disturbances to wetland transition areas as well as . . . [one] associated [SWRPA] disturbance." Though another SWRPA disturbance was "unavoidable," it would "be compensated for by the restoration of . . . a disturbed SWRPA at

---

[11]    While appellants argue the DEP failed to explain why the proposal would no longer result in the "permanent or long-term loss of [a] unique or irreplaceable area[,]" that finding was largely unexplained in the earlier denials and, given that the proposal provided for a pedestrian/bike trail and did not affect any "unique wildlife habitat," it is unclear what basis there would be for finding such a loss.

the same location." The DEP found that there was no possible "alternative alignments" due to existing developments, but that the proposed construction would "not result in any disturbance to wetlands or transition areas, or habitat for endangered or threatened species, or marine fish or fisheries" or to any "unique wildlife habitat[s]," and therefore would not result in any "permanent or long-term loss of unique or irreplaceable areas." After reciting the history of the Barnegat Branch Trail, the DEP again noted that the roadway would "not preclude the development of [a] pedestrian/bike trail as envisioned by the Barnegat Branch Trail Conceptual Plan." Finally, the DEP found that the project was "designed to minimize the vegetative disturbance to maximize the buffering between the proposed road and the existing residential developments" — with "a minimum buffer of [fifteen] feet" — prohibited the future construction of additional points of "ingress and egress to the road," and was "located within an existing transportation corridor."

Appellants also contend that the DEP failed to adequately explain why it found the proposal complied with the basic location rule, N.J.A.C. 7:7E-6.2,[12] which it found was not satisfied in 2006

---

[12] The basic location rule provides:

> (a) A location may be acceptable for development under N.J.A.C. 7:7E-3, 4, 5, 5A, 5B and 6, but the Department may reject or

and 2009. Specifically, they argue the DEP's finding of compliance is flawed because it failed to address "how approval of the proposed development is 'reasonably necessary'" to promote public health, safety, and welfare, the "previous bases for denial," or why the traffic benefits "outweigh[] the previous public health and environmental justifications for denial."

The DEP found the rule was not satisfied in 2006 and 2009 because the proposals failed to meet subsections (1) and (3). Specifically, it found the project did "not promote public welfare [because it] serv[ed] only to promote higher vehicle miles as opposed to promoting recreational uses such as biking and walking." In 2006, the DEP found the project did not "enhance the natural environment" because the ROW was "a natural area on the mend" and "[c]onstruction of the proposed road would eliminate most of any naturally re-established habitat." It provided no reason for its

conditionally approve the proposed development of the location as reasonably necessary to:

1. Promote the public health, safety, and welfare;

2. Protect public and private property, wildlife and marine fisheries; and

3. Preserve, protect and enhance the natural environment.

[N.J.A.C. 7:7E-6.2 now codified at N.J.A.C. 7:7-14.2.]

A-1088-14T2

2009 finding that the proposal did not enhance the natural environment.

In finding the rule satisfied in 2014, the DEP again acknowledged that it was reconsidering its prior finding, based in part on Lacey's revised plans' elimination of the Oak Bluff Avenue portion included in the 2009 proposal. It found that the project would "promote[] public health, safety, and welfare" by alleviating traffic congestion on Route 9 and providing a "robust transportation network, which allows for flexibility and enhanced emergency access." After noting the proposal would "not impact private or public property" or "impact endangered or threatened species, wetlands, marine fisheries or special environments," the DEP found it fully complied with the basic location rule.

Appellants also argue that the DEP failed to adequately explain why it found the proposal complied with the secondary impacts rule, N.J.A.C. 7:7E-6.3,[13] which it found was not satisfied

_____

[13] The secondary impacts rule provides in pertinent part:

> (a) Secondary impacts are the effects of additional development likely to be constructed as a result of the approval of a particular proposal. Secondary impacts can also include traffic increases, increased recreational and any other offsite impacts generated by onsite activities which affect the site and surrounding region.

> (b) Coastal development that induces further development shall demonstrate, to the

A-1088-14T2

in 2006 and 2009. They argue the DEP ignored its prior findings that the roadway would have a significant negative impact on the County's planned multi-use trail and existing public open space, and improperly relied on the claim that the Barnegat Branch Trail was designed with the roadway in mind, as the trail plan predated the first roadway proposal.

In 2006, the DEP concluded the secondary impacts rule was not satisfied because Lacey had failed to "demonstrate[] that the secondary impacts of the development will satisfy the [CZM] rules."

---

maximum extent possible, that the secondary impacts of the development will satisfy the [CZM] rules. The [DEP] may restrict coastal development from connecting to an approved infrastructure in order to prevent adverse impacts to special areas and to protect and preserve coastal resources.

(1) The level of detail and areas of emphasis of the secondary impact analysis are expected to vary depending upon the type of development. . . .

(2) Secondary impact analysis must include an analysis of the likely geographic extent of induced development, its relationship to the State Development and Redevelopment Plan, as assessment of likely induced point and non-point air and water quality impacts, and evaluation of the induced development in terms of all applicable [CZM] rules.

[N.J.A.C. 7:7E-6.3 now codified at N.J.A.C. 7:7-14.3.]

A-1088-14T2

Its conclusion was based on Lacey's failure to provide analyses of "what intersections would be impacted by" construction of the road, the capacity of "any receiving roadway," and which areas of Lacey were expected to experience increased "development pressure" as a result of the new road. The DEP noted that, while the project was proposed to help alleviate traffic on Route 9, "[l]ong term traffic management of Route 9" would still require implementation of "a Comprehensive Route 9 Corridor Plan." The DEP also relied upon the "significant secondary impact on Ocean County's plan to construct a multi-use trail," the lack of support for the project from the adjacent towns, and the fact that the "construction as proposed would effectively negate the significant public monies expended by Ocean County."

The DEP expressed similar concerns in 2009, finding noncompliance based on the "increased roadway capacity" that would result from the new road and that capacity's "potential to promote additional growth areas within the Township." It also once again relied upon the lack of a comprehensive corridor plan, the impact on the County's planned multi-use trail, the neighboring towns' lack of support, and the significant funds already spent by the County.[14]

---

[14] It did not, as appellants assert, make any finding that the construction would have an adverse impact on public open space.

A-1088-14T2

In finding that the newest proposal complied with the secondary impacts rule, the DEP began by noting that it was reconsidering its prior decisions. It first explained that the proposed road "traverses an area of [Lacey] that consists primarily of residential and commercial development," and that "the site is designated a Suburban Planning Area according to the State Development and Redevelopment Plan." It then detailed the composition of the "Secondary Impact Review area," which, according to information provided by Lacey, "is already 84.57% develop[ed] with residential and commercial properties" and, "[o]f the remaining 15.43% of undeveloped properties, [almost all] are publicly owned lands . . . [that] will not be developed and the [rest are] undeveloped privately owned land [that] is already zoned for approvable residential development." In light of this information, the DEP concluded that "the proposed roadway will not induce further development." Moreover, it noted, one of the permit conditions prohibited building "additional curb cuts," thereby "prohibiting any future points of ingress/egress to the new roadway." Finally, the DEP found that "the pedestrian/bikeway component of the Railroad Avenue project is consistent with the planned Barnegat Branch Trail," noting that "the Ocean County Planning Department designed the Barnegat Branch Trail with Railroad Avenue in mind and ha[d] stated on [its] website that the

roadway will not preclude the development of a pedestrian/bike trail as envisioned by the Barnegat Branch Trail Conceptual Plan."

As with the other rules, despite appellants' argument to the contrary, the DEP was not required to "rebut [its] previous findings with evidence from the record." Nevertheless, Lacey supported its application with data demonstrating that the proposal would not induce further development because the area surrounding the proposed roadway was already almost eighty-five percent developed, and the remaining properties were either public land protected from development or private land for which development was already authorized. The DEP relied upon this unrebutted data and its finding that the proposal would not impact the County's plan for the Barnegat Branch Trail, as it provided for construction of that trail.

Appellants also argue that the DEP failed to adequately explain why it found the proposal complied with the buffers and compatibility of uses rule, N.J.A.C. 7:7E-8.13,[15] which it found

---

[15] The buffers and compatibility of uses rule in effect at the time of the DEP's decisions provided, in relevant part:

> (a) Buffers are natural or man-made areas, structures, or objects that serve to separate distinct uses or areas. Compatibility of uses is the ability for uses to exist together without aesthetic or functional conflicts.

was not satisfied in 2006 and 2009. They argue the DEP's finding that the fifteen-foot buffer between the roadway and nearby residences was sufficient ignored its previous findings that the full fifty-foot width of the ROW was a buffer "worthy of protection."

---

(b) Development shall be compatible with adjacent land uses to the maximum extent practicable.

(1) Development that is likely to adversely affect adjacent areas, particularly Special Areas N.J.A.C. 7:7E-3, or residential or recreation uses, is prohibited unless the impact is mitigated by an adequate buffer. The purpose, width and type of the required buffer shall vary depending upon the type and degree of impact and the type of adjacent area to be affected by the development, and shall be determined on a case by case basis.

. . . .

(3) The following apply to buffer treatment:

(i) All buffer areas shall be planted with appropriate vegetative species, either through primary planting or supplemental planting. This landscaping shall include use of mixed, native vegetative species, with sufficient size and density to create a solid visual screen within five years from the date of planting.

[N.J.A.C. 7:7E-8.13 now codified at N.J.A.C. 7:7-16.11.]

41                                                    A-1088-14T2

In 2006 and 2009, the DEP based its conclusion that the rule was unsatisfied on its finding that the proposals "would greatly reduce th[e] vegetative buffer" provided by the ROW "between the existing residential properties on the west and the commercial properties on the east."

In 2014, the DEP found that the pedestrian and bike trail, together with the buffers on either side of it, would provide "a minimum buffer of [fifteen] feet between the proposed road and any residential property boundary," with an even wider buffer along the large majority of road. With this buffer in place, the DEP found the project was "compatible with the existing adjacent land uses to the maximum extent practicable" and therefore satisfied the rule on buffers and compatibility of uses.

Notably, the DEP's 2006 decision did not, as appellants allege, find "that the 2005 road proposal would interfere with" the planned Barnegat Branch Trail. Moreover, the DEP's earlier conclusion that the rule was not satisfied was not based upon any finding that the proposed projects were not "compatible with adjacent land uses." N.J.A.C. 7:7E-8.13(b). Rather, the earlier denials found the rule was not satisfied because the proposals would eliminate the fifty-foot buffer provided by the ROW, findings which do not address what the rule considers and do not, without more, support a finding that the rule was unsatisfied. The DEP's

conclusion was supported by its finding that the fifteen-foot buffer rendered the project compatible with adjacent land uses, as required by the rule.

In conclusion, we are satisfied that, despite the earlier denials, the DEP's Summary Report provided more than adequate reasons for issuing Lacey the CAFRA permit and that the agency properly exercised its authority when it granted the permit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION